IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| BELLEVUE FARM OWNERS ASSOCIATION, a non-profit corporation; LAUREN BARRETT and WILLIAM BARRETT, husband and wife, trustees of the Laurie Barrett Residential Trust and of the Bill Barrett Residential Trust; WEBSTER AUGUSTINE III, an individual; HOOPOE LLC, a Washington Limited Liability Company; GIGI BIRCHFIELD and MARK BAUTE, husband and wife; TIMOTHY DOHERTY and CHRISTINE DOHERTY, husband and wife; PATRICK DOHERTY, an individual; GLEN CORSON and KIM KYLO-CORSON, husband and wife; JANTANA KUPPERMANN and BARUCH KUPPERMANN, husband and wife; RODNEY SMITH and MARY MARGARET SMITH, husband and wife; MATTHEW STRAIGHT and VERONICA STRAIGHT, husband and wife; TOM TUCCI and DIANE TUCCI, husband and wife; and DANA PIGGOT, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 77830-7-I (consolidated with No. 78300-9) |
| Respondents, | ) ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| CHAD STEVENS and "Jane Doe" STEVENS, husband and wife, | ) ) ) | |
| Appellants, | ) ) | |
| PETE FINDLEY and "Jane Doe" FINDLEY, husband and wife; CASCADE MOUNTAIN RENTALS LLC, a | ) ) ) ) | |

Washington Limited Liability Company; )
and DOES 1 to 10, Inclusive, )
    )
    Defendants. )
    )
_____ )
    )
BELLEVUE FARM OWNERS )   No. 77401-8-I
ASSOCIATION, a non-profit corporation, )   (consolidated with No.
LAUREN BARRETT and WILLIAM )   77603-7)
BARRETT, husband and wife, trustees of )
the Laurie Barrett Residential Trust and of )
the Bill Barrett Residential Trust; )
WEBSTER AUGUSTINE III, an individual; )
GIGI BIRCHFIELD and MARK BAUTE, )
husband and wife; TIMOTHY DOHERTY )
and CHRISTINE DOHERTY, husband and )
wife; PATRICK DOHERTY, an individual; )
GLEN CORSON and KIM KYLO- )
CORSON, husband and wife; JANTANA )
KUPPERMANN and BARUCH )
KUPPERMANN, husband and wife; )
RODNEY SMITH and MARY MARGARET )
SMITH, husband and wife; MATTHEW )
STRAIGHT and VERONICA STRAIGHT, )
husband and wife; TOM TUCCI and )
DIANE TUCCI, husband and wife; and )
DANA PIGGOT, an individual, )
    )
    Respondents/Cross Appellants, )
    )
HOOPOE LLC, a Washington Limited )
Liability Company, )
    )
    Plaintiff, )
    )
    v. )
    )
CHAD STEVENS and "Jane Doe" )
STEVENS, husband and wife, )
    )
    Appellants/Cross Respondents, )
    )
PETE FINDLEY and "Jane Doe" )
FINDLEY, husband and wife; CASCADE )
MOUNTAIN RENTALS LLC, a )
    )

- 2 -

No. 77830-7-I, 77401-8-I & 78430-7-I/3

Washington Limited Liability Company;          )
and DOES 1 to 10, Inclusive,                   )
                                               )
                    Defendants.                )
                                               )
                                               )
BELLEVUE FARM OWNERS                           )          No. 78430-7-I
ASSOCIATION, a non-profit corporation;         )
LAUREN BARRETT and WILLIAM                     )
BARRETT, husband and wife, trustees of         )
the Laurie Barrett Residential Trust and of    )
the Bill Barrett Residential Trust;            )
WEBSTER AUGUSTINE III, an individual;          )
GIGI BIRCHFIELD and MARK BAUTE,                )
husband and wife; TIMOTHY DOHERTY              )
and CHRISTINE DOHERTY, husband and             )
wife; GLEN CORSON and KIM KYLLO-               )
CORSON, husband and wife; JANTANA              )
KUPPERMANN and BARUCH                          )
KUPPERMANN, husband and wife;                  )
RODNEY SMITH and MARY MARGARET                 )
SMITH, husband and wife; MATTHEW               )
STRAIGHT and VERONICA STRAIGHT,                )
husband and wife; TOM TUCCI and                )
DIANE TUCCI, husband and wife; AND             )
DANA PIGOTT, an individual,                    )
                                               )
          Appellants/Cross Respondents,        )
                                               )
                    v.                         )
                                               )
CHAD STEVENS and "Jane Doe"                    )
Stevens, husband and wife,                     )
                                               )
          Respondents/Cross Appellants,        )
                                               )
                    and                        )
                                               )
ROBERT STEVENS and DOES 1-10,                  )
Inclusive,                                     )
                    Defendants.                )

- 3 -

ANDRUS, A.C.J. — Twenty homeowners in a San Juan Island development known as Bellevue Farm have spent the better part of a decade fighting—both literally and figuratively—over the meaning of a set of restrictive covenants governing the use of their land and a waterfront parcel owned by the homeowners as tenants in common. They have also fought over the boundaries between privately owned lots and the waterfront parcel, the erection of a spite fence in front of property owned by Chad Stevens, and the management and operation of their homeowner association, Bellevue Farm Owners Association (BFOA).

After four years of summary judgment rulings, a prior appeal to this court,[1] a 2016 bench trial, and a 2017 jury trial, no one came away happy with the result. The record reveals a level of animosity between Stevens and his neighbors and incivility between some of the parties and the attorneys that surpasses anything this court has ever seen. With the exception of one decision on certain homeowners' entitlement to an award of attorney fees under the restrictive covenants, we affirm the trial court.

## I. FACTUAL BACKGROUND

### A. Bellevue Farm

Bellevue Farm is a 54-acre development consisting of 14 separate lots located on San Juan Island's Westcott Bay. The farm was originally short-platted in 1994 into four residential lots (BF Lots #1 through #4) and one waterfront lot approximately 2000 feet in length (common waterfront). The short plat declared

---

[1] Bellevue Farm Owners Ass'n v. Stevens, 198 Wn. App. 464, 394 P.3d 1018 (Bellevue Farm I), review denied, 189 Wn.2d 1038, 413 P.3d 565 (2017).

that "the shoreline common area shall be owned in common by all owners of lots within the plat."



In 1994, Bellevue Farm's former owner incorporated BFOA as a Washington non-profit corporation and adopted bylaws and a set of covenants, conditions, and restrictions (1994 CC&Rs). The owners amended the 1994 CC&Rs in 1997 (1997 CC&Rs).

In 1995, Brad Augustine and some investors purchased BF Lot #4 and short-platted it into eight smaller residential lots. These eight lots—each between

one and one-half and two acres in size—became known as South Bellevue Farm and are governed by a separate homeowner association, South BFOA, subject to restrictive covenants recorded against the South Bellevue Farm lots. The South Bellevue Farm lots (South BF Lots #1 through 8) share a water well, a tennis court, and a pond. Within South Bellevue Farm, there are four lots that face the common waterfront and four upslope lots. In 1997, the lot owners in Bellevue Farm and South Bellevue Farm agreed to combine the two groups' meetings and to study the issue of functioning as one homeowner association in the future. From that point forward, while BFOA and South BFOA were two separate entities, each board was composed of the same members so that, in effect, BFOA and South BFOA were considered to be one entity.

B. The Protagonists in this Saga

Every owner in Bellevue Farm and South Bellevue Farm was a party to this lawsuit. The following photograph shows the relative locations of the parcels and their owners:



Chad Stevens.  Stevens, a full-time Cle Elum resident, purchased BF Lot #3, a total of 10 acres, in June 2005.  He later short-platted the lot into two five-acre parcels, BF Lots #3A and #3B.[2]  When Stevens purchased the property, the

---

[2] BF Lot #3A is identified in the aerial photograph as Parcel No. 462421002000.  BF Lot #3B is identified as Parcel No. 462421007000.

upslope portion, now BF Lot #3A, had a three-bedroom farmhouse, constructed in 1889, and a two-bedroom "hatch house," constructed around 1996.

BF Lot #3B borders the common waterfront. The widest and most usable section of the entire common waterfront sits in front of Stevens's parcel. Stevens later constructed a four-bedroom beach house on BF Lot #3B facing this waterfront area, completing it in July 2012. BF Lot #3B also has a 100-year-old apple orchard. According to Stevens, the apples are primarily the type used in making hard cider. Stevens also planted a vineyard on the upslope parcel.

Stevens purchased the property for its waterfront access and he knew he would have to rent out the property to afford its mortgage. He obtained transient rental permits for both lots and, starting in 2008, began marketing the properties to vacation renters. This short-term rental activity, along with his subsequent open hostility toward and lack of candor with his neighbors, contributed to serious conflicts before and during this lawsuit.

Mark Baute and Gigi Birchfield. Baute and Birchfield, a married couple, are attorneys who live in California. They initially purchased South BF Lot #1, with a home facing the waterfront, from Brad Augustine in 2005.[3] This lot is adjacent and to the south of Stevens's BF Lot #3B. Baute and Birchfield obtained a transient rental permit for short-term vacation rentals and hired a local property manager to rent this house. They have rented out this house since they purchased it in 2005.

_____

[3] South BF Lot #1 is identified in the aerial photograph as "154," which refers to its address at 154 Bellevue Farm Road.

Five years later, BF Lot #2B, also facing the waterfront and adjacent to and north of Stevens's lots, came up for sale.[4] Baute and Birchfield purchased the land with their close friends, Jantana and Dr. Baruch Kupperman. The two couples subsequently built a large, joint home on the property.

As a result of these acquisitions, Baute and Birchfield currently have an ownership interest in the lots on both sides of Stevens's lots. The relationship between Baute and Stevens and Stevens's attorneys became particularly adversarial throughout this litigation, with Baute leading the BFOA members into taking certain actions that contributed significantly to the escalation of disputes with Stevens.[5] Baute was a BFOA officer for the years relevant to this lawsuit.

Jantana and Dr. Baruch Kupperman. The Kuppermans, who reside in California, joined Baute and Birchfield in purchasing BF Lot #2B and building a large, multi-family home on that lot in 2011. They visit between two and six weeks each year. Together, Baute and Dr. Kupperman obtained a transient rental permit for the large house. The parties disagreed about the frequency of vacation rentals for the home on BF Lot #2B. Baute testified they rarely rent out the larger home.

---

[4] BF Lot #2B is identified in the aerial photograph as Baute/Kupperman, Parcel No. 462421009000. It is also known by its address of 78 Husky Lane.

[5] Baute was initially admitted pro hac vice to participate as counsel for BFOA and the 19 owners, of which he is one, in its lawsuit against Stevens. After years of complaints regarding Baute's misconduct toward Stevens at Bellevue Farm and misconduct within the litigation, the trial court took the extraordinary step of revoking Baute's pro hac vice admission, disallowing him from representing anyone other than himself and his wife, Birchfield. The court found that Baute's personal interest in the matter "consistently and substantially interfered with his ability and/or willingness to serve as an attorney for the other Plaintiffs in a manner that is appropriately respectful of the Defendants, their attorneys, and this [c]ourt." The court also found that the litigation had been conducted "with unacceptable levels of personal invective, inappropriately emotional and sometimes unnecessary pleadings, and an overall lack of the focus and civility necessary for the efficient use of judicial resources."

Stevens disputed that testimony, contending the house had been completely booked by short-term renters in the summers.

Glen Corson and Kim Kyllo-Corson.  The Corsons purchased South BF Lot #8, one of the upslope lots without direct waterfront access,[6] in 1997.  They built their first home on the lot shortly after purchase and subsequently built a larger home on the same parcel in 2015.  Before moving into the home as their full-time residence when they retired, the Corsons used their Bellevue Farm property as a vacation home.

Corson held the position of BFOA president, a volunteer position, for roughly a decade—from 2006 or 2007 to 2017.  His role in enforcing what he believed were reasonable restrictions on renter use of the common waterfront led to Stevens filing counterclaims against him.  Corson took significant direction from Baute in his management of BFOA's day-to-day operations.

Veronica and Matthew Straight.  The Straights own South BF Lot #4, a waterfront lot.[7]  When they purchased their land, only one lot in Bellevue Farm had a home constructed on it.  The Straights built their home in 1998.

Matthew Straight, like Baute, is an attorney.  Straight practices real estate law in Seattle and has extensive experience drafting homeowner association governing documents.  Because of his legal expertise, he was intimately involved in the management of BFOA and South BFOA and in reviewing and proposing amendments to the 1997 CC&Rs—actions at the heart of the dispute with Stevens.

---

[6] The Corsons' parcel is identified as 105 Webster Drive in the photograph.

[7] The Straights' South BF Lot #4 is identified as 234 Bellevue Farm Road, or Parcel No. 462452004000.

Lauren and William Barrett. The Barretts reside full time in Seattle. They purchased South BF Lot #2 in 1995 or 1996,[8] and built a house in 2000.

Hoopoe LLC. During the relevant period of this lawsuit, Hoopoe LLC owned BF Lot #1 (now divided into BF Lot #1A and BF Lot #1B).[9] San Juan Island residents Charles R. Anderson and Pamela R. Gross formed Hoopoe to acquire BF Lot #1 in early 2009. Geographically isolated from the rest of the Bellevue Farm properties, BF Lot #1 is undeveloped.

Mary Margaret and Rodney Smith. The Smiths own BF Lot #2A, which borders the common waterfront.[10] The Smiths, residents of Washington, D.C., built a home on their lot after they purchased it.

Dana Pigott. Pigott, who resides full time in the Seattle area, owns South BF Lot #3.[11] She had a home built on her lot, which also borders the common waterfront. Pigott did not rent her San Juan Island home to vacationers, but she did make it available to non-family members through charity auctions.

Diane and Thomas Tucci. The Tuccis own the upslope parcel, South BF Lot #5.[12] The Tuccis use the home on their lot relatively infrequently, as it is their second vacation home. They have applied for a transient rental permit, but it is unclear if they have actually ever rented the home to vacationers.

---

[8] The Barrett parcel is located at 178 Bellevue Farm Road in the photograph.

[9] The Hoopoe lots are Parcel Nos. 462421008000 and 462421005000 in the photograph.

[10] The Smiths' parcel is identified in the photo as Parcel No. 462421004000.

[11] Pigott's parcel is located at 208 Bellevue Farm Road and is identified on the photo as Parcel No. 462452003000.

[12] The Tucci lot is identified on the photo as Parcel No. 462452005000.

Web Augustine. Web Augustine's brother, Brad, was the original developer of Bellevue Farm. Web Augustine has owned the upslope lot, South BF Lot #6, since 2000.[13] Two years later, he began renting the home on the lot to short-term vacation renters. He resides off island and visits, approximately, eight days a year.

Christine and Timothy Doherty. Christine and Timothy Doherty purchased South BF Lot #7 in 2010.[14] Like most of the other owners in Bellevue Farm, they built a house after purchasing the lot. The Dohertys live off island, and like Stevens, Baute, and Web Augustine, the Dohertys rent their home to vacationers.

C. The Summers of 2011 and 2012

The major events leading to this lawsuit occurred in the summers of 2011 and 2012. In 2011, Stevens booked three weddings to occur on BF Lots #3A and #3B. After the first wedding party, with 125 guests in attendance, several Bellevue Farm and South Bellevue Farm owners complained to Stevens about the number of people on the waterfront, the traffic, and the noise that lasted well into the night. There was evidence that the wedding participants and guests brought shuttle buses, diesel trucks, portable toilets, and kitchen catering equipment onto Bellevue Farm. The vehicle traffic blocked Bellevue Farm Road, preventing owners from entering or leaving their property. Loud music played late into the night, disrupting the owners' solitude.

Several owners questioned whether the wedding was allowed under Stevens's transient rental permits. When Stevens realized weddings were not a

---

[13] Web Augustine's South BF Lot #6 is identified in the photo as Parcel No. 462452006000.

[14] The Dohertys' parcel is located at 145 Bellevue Farm Road and identified as Parcel No. 462452007000.

good fit for the quiet Bellevue Farm community, he apologized for the disruption and offered to cancel his two other bookings. Corson, BFOA's then-president, said there was no need to cancel the two weddings but asked that Stevens be present during the weddings and receptions to ensure the music ended at 9:00 p.m. Stevens ceased marketing his property for weddings that summer, and he booked no other weddings.

Despite Stevens's agreement not to rent his property for weddings, several owners grew concerned about how regularly such events might occur at Bellevue Farm. According to Glen Corson, the weddings "kind of woke everybody up—and got them talking with each other . . . it woke everybody up to the fact that we were having more people there more often[,] and it looked like it was going to get more and not less." The owners felt Stevens's rentals might threaten the low density, quiet, private nature of Bellevue Farm.

In April 2012, several of the owners discovered that Stevens was in arears on his mortgage for BF Lots #3A and #3B by over $120,000 and that the lender had issued a foreclosure notice. A notice of a trustee's sale was set for July 6, 2012. In the short term, some owners became concerned because the Barretts had rented Stevens's farmhouse and hatch house for their son's wedding in late July 2012. From a long-term standpoint, Baute and Straight were concerned that if a lender purchased the property in foreclosure, BFOA could lose control over the use of the residences on the lots, and the lender might not maintain the property or pay homeowner association dues.

Stevens's neighbors alerted him to the notice of foreclosure. Stevens himself was unaware that his business partner had stopped paying the mortgage on the property. When he learned of the problem, he paid off the outstanding balance and refinanced the property.

While Stevens was in the midst of avoiding foreclosure, Baute told Stevens he thought Stevens was violating BFOA's 1997 CC&Rs by allowing renters to use the common waterfront. Several owners agreed with Baute that the 1997 CC&Rs precluded any renters from accessing the common waterfront. Stevens disagreed with their interpretation.

Baute also questioned whether Stevens was following county requirements for transient rental permits. In early May 2012, Baute told Stevens that a county ordinance prevented Stevens from renting both the hatch house and the nearly completed beach house at the same time. Baute's understanding of the transient rental permit ordinance caused Stevens to reconsider his agreement, made almost a year earlier, to rent his farm house, hatch house, and beach house to Blake Barrett, the son of Lauren and William Barrett, for Blake's July 28, 2012 wedding. Stevens called Barrett to cancel the reservation because he was unsure if he was legally able to rent both residences at the same time under his transient rental permit. Although Stevens ultimately concluded he had the permits to rent the farm house and the newly constructed beach house to the Barretts, he refused to allow them to hold the wedding reception on his property. Although the Barretts could have held the reception on the common waterfront in front of Stevens's lot, they were unsure where the common waterfront boundary was located and, thus, could

not guarantee everyone would stay off of BF Lot #3B.  They scrambled to find an alternative location and ultimately used the waterfront area in front of the Baute/Kupperman house.

Stevens's refusal to allow the Barretts to use his land for the wedding, less than two months before it was scheduled to occur, caused an extremely negative backlash from Stevens's neighbors.  Blake believed Stevens was holding the rental over his parents' heads to punish them for not agreeing with Stevens on the issue of renter access to the common waterfront.  The Barretts were understandably angry at Stevens over this incident, as were most of the other owners, who believed their children should be permitted to use the waterfront for wedding ceremonies.  As Kyllo-Corson testified, "who would do that to a bride? . . . I don't want Bellevue Farm[] to be known as somebody that's going to cancel the bride's . . . wedding weeks or even a month before hand."  Stevens's refusal to let the Barretts use his land for their son's wedding, at such a late date, was a "pivotal point" with the owners, causing them to band together against him.  Stevens appears not to have appreciated the consequences of his actions.

At BFOA's annual meeting on May 12, 2012, the owners discussed whether renters had the right to access the common waterfront and a floating dock.  Stevens, who participated in that meeting, took the position that renters had historically always been permitted on the waterfront and should be treated as guests of the owners.  Stevens relied on the language of paragraph 4(a) of the 1997 CC&Rs, which allowed guests of owners to use that area.  Stevens argued the word "guests" in article 4(a) meant both houseguests of owners and short-term

vacation renters. Most of the owners—who were, by that point, already disinclined to agree with any position Stevens took—disagreed with his broad interpretation of the word "guests."

Although there was no resolution to the issue at this meeting, Corson suggested the county transient rental permits required owners to provide a code of conduct for renters. Stevens offered to draft a proposed set of rules for renters and to disseminate the draft to the owners. In early June 2012, Stevens circulated a proposed set of "Rules and Regulations Regarding Common Land and Common Dock of Bellevue Farm Owners Association." These proposed rules would have permitted waterfront access to short-term renters if the homeowners obtained insurance to cover damages caused by those renters and agreed to indemnify BFOA and the other owners for any injuries the renters sustained.

On June 13, 2012, Stevens circulated a proposed "Agreement Regarding Respect of Property Rights and Use of Common Areas in Bellevue Farm." This document would have, if signed by Bellevue Farm and South Bellevue Farm owners, allowed renters to use both the tennis courts in South Bellevue Farm and Bellevue Farm's common waterfront. Stevens received less than enthusiastic feedback on his interpretation of the 1997 CC&Rs and his proposed agreement. According to Corson, after Stevens discovered his neighbors did not support his interpretation of the 1997 CC&Rs, Stevens began complaining to Corson about children driving golf carts on his property, people trespassing and picking his apples in his orchard, and people using his property as a picnic ground.

Straight and Baute prepared an alternative proposal, which Straight circulated via e-mail on June 20, 2012. Straight proposed what he labeled as a "clarification" of article 4(a) and an "Interim License Agreement." The proposed additional language for article 4(a) read:

> As provided in the first two sentences of this Article 4a, the common land (including but not limited to the common waterfront) and common dock is not to be used by tenants (whether short term or long term), and is to be reserved for and used only by owners, as described and limited above in this Article 4a. However, owners may seek permission from [BFOA] and its Board to be allowed to use a limited and specified area of the common waterfront, in the form of a written and signed revocable license agreement, and such permission and the terms of any such revocable license, if any, will be determined in the sole and absolute discretion of [BFOA] and the Board. Tenants are not considered to be guests.

And under the proposed license agreement, owners with transient rental permits could allow renters limited access to the common waterfront. Accompanying the proposed license agreement was a hand-drawn map of Bellevue Farm and the common waterfront with three small areas designated for renters' use.

On June 21, 2012, Corson distributed the Straight/Baute proposal to the owners with a notice of a July 5, 2012 special meeting. In this notice, Corson stated that if any owner refused to approve the article 4(a) clarification or the proposed license agreement, the owners would also discuss "whether BFOA should sue any such owner for declaratory relief, quiet title and a permanent injunction." Corson also asked for owners to submit their votes via e-mail ahead of the meeting if they could not attend. Stevens objected, contending it was inappropriate for Corson to solicit votes ahead of the meeting. Baute, in response, told Stevens the "results were in" before the special meeting began.

- 17 -

Stevens attended the July 5, 2012 special meeting to register his opposition to any change to the 1997 CC&Rs that restricted renters' use of the common waterfront and to any license agreement that could be revoked on the whim of BFOA. During the meeting, the owners voted to approve the clarification to article 4(a) of the 1997 CC&Rs. Stevens voted against the proposal and Web Augustine abstained.

The next major dispute arose over Stevens's proposed construction of a 5,600 square foot barn on BF Lot #3A. In mid-July 2012, Stevens submitted final plans to the county for a building permit for a large barn. Stevens refused to tell his neighbors the purpose for the barn, but based on notations on the plans, they concluded he intended to use it to process alcohol—specifically, wine and hard cider. The plans, in fact, bore the notation:

> Building use note: This mixed use building is proposed to be used as a personal, small scale winery & storage for farm equipment on the first floor with an ADU office on the second floor. In the future the facility may sell wine.

The drawings called out resting tanks, fermentation tanks, barrel storage, a bottling area, a large area for staging and fruit storage, racking facilities, and a "wine/cider making lab." Although Stevens testified he planned to use the barn only to store farming equipment, the plans showed a very small area for equipment storage in comparison to the area designated for wine- or cider-making. Given the size of the barn and the number and size of fermentation tanks, resting tanks, and wine barrels shown on the plans, Corson, a retired brew master at Rainier Brewery, believed Stevens intended to start a "moderate sized commercial winery." The

Bellevue Farm owners disbelieved Stevens when he tried to assure them he had no intention to start a commercial business on BF Lot #3A.

Fearing that Stevens intended to open an alcohol processing facility or commercial winery in the barn, the owners—who wanted to protect the seclusion, privacy, and tranquility of Bellevue Farm—decided they needed to amend the 1997 CC&Rs to prevent this commercial activity. Corson called a second special meeting for August 4, 2012 to consider an amendment to article 5 of the 1997 CC&Rs. This proposed amendment, also drafted by Straight, identified allowable and prohibited agricultural uses and activities. Activities explicitly prohibited included "the sale of liquor, wine, beer, hard cider or other alcoholic beverages," and the "use of industrial, manufacturing or processing equipment for distilling or making wine, liquor, beer, hard cider or alcoholic beverages for sale."

The day before the special meeting, August 3, 2012, Baute testified he went to Stevens's property to try to talk to Stevens about the proposal. Stevens told Baute he was trespassing, told him to "get the [f—k] off of his property," and threatened to call the police. Corson testified he too went to speak to Stevens and found him inside the beach house finishing some construction work. Stevens told Corson he was trespassing and "to get off of his property."

At the August 4, 2012 special meeting, the members of BFOA adopted Straight's proposed article 5(g) to the 1997 CC&Rs. Stevens refused to attend the meeting but cast his votes against the amendment by e-mail.

While the Bellevue Farm owners fought over renter access rights and permissible agricultural activities, some owners observed Stevens and his father

removing an apple tree on a part of what those owners believed to be the common waterfront. Stevens, who had maintained the apple tree for the entire time he had owned BF Lot #3B, assumed it was his tree.

To resolve this conflict, Corson commissioned a survey of the boundary line between the common waterfront and Stevens's BF Lot #3B. Corson and Stevens both assumed the boundary ran in a straight line approximately 75 feet back from the ordinary high watermark. In fact, the survey revealed the boundary line was crooked, and it turned out the apple tree Stevens cut down was on the common waterfront, not on BF Lot #3 as he had assumed based on the previously understood, but improper, boundary line. Stevens apologized to the owners afterward for mistakenly cutting down the tree. His apology did little to mend his relationship with his neighbors.

After the owners concluded their special meeting on August 4, 2012, several attendees voiced concern over what they perceived as Stevens's unreasonable behavior. Apparently they came to believe that the best way to assert control over the situation was to build a fence at the boundary of the common waterfront and Stevens's lot. Corson testified there was a general agreement amongst the owners that it was a good idea to build the fence, although they took no official vote on whether to construct such a fence. Corson, as president of BFOA, decided to install the fence.

Other incidents allegedly occurred that summer. According to Baute and Dr. Kupperman, after the tense special meetings in July and August 2012, they became afraid of Stevens after he fired a shotgun over their heads near the

waterfront.   Baute thought Stevens shot at them as an act of intimidation or to "mark[] his territory."   Several owners testified that once they heard about this alleged incident, they were uninterested in approaching Stevens to talk to him about any of the disputes.  They were outraged that Stevens would fire a shotgun in such close proximity to the houses.

D. <u>BFOA Lawsuit against Stevens and the Spite Fence</u>

Several things occurred in September 2012.   First, BFOA and all of the owners (Owner Plaintiffs) initiated this lawsuit against Stevens on September 11, 2012.  BFOA and the Owner Plaintiffs sought declaratory relief as to the validity of article 4(a) and 5(g) of the 1997 CC&Rs.   They sought an injunction to prohibit Stevens's renters from using the common waterfront.   BFOA and the Owner Plaintiffs, except Hoopoe, alleged Stevens had committed trespass by destroying the apple tree they had learned was on the common waterfront and not on Stevens's lot.   And Owner Plaintiffs Baute, Birchfield, and the Kuppermans asserted a claim against Stevens for timber trespass under RCW 4.24.630 relating to Stevens's 2011 removal of a willow grove that spanned the parties' joint boundary.[15]

Second, Stevens held his own wedding on BF Lot #3B on September 15, 2012.   The Owner Plaintiffs were aware of his intended nuptials, as he had informed Baute, Corson, and Straight of the planned event months earlier.  Corson, in turn, informed some of the Owner Plaintiffs about the planned event.

---

[15] Dr. Kupperman also asserted a negligent infliction of emotional distress claim arising out of the alleged August 2012 shotgun incident.  This claim was presented to a jury in 2017 but dismissed pursuant to CR 50(a) at the close of Dr. Kupperman's case-in-chief.

Third, on either September 16 or 17, 2012, Corson's contractor began digging post holes and built a split rail cedar fence on the boundary line between the common waterfront and Stevens's BF Lot #3B. Corson did not ask the BFOA Board of Directors (Board) for permission to build the fence, but he used BFOA funds to do so. The fence was originally built with five openings along the boundary line to allow people to walk through to the waterfront. Corson was not present when the fence was built, and Baute gave the contractor direction on where to place the openings. Of the five openings in the fence, the one available for Stevens's renters—had he signed the license agreement—was partially blocked by a large tree. There were no openings in the fence in front of Stevens's beach house. Baute testified he decided to spread out openings, with an emphasis on openings on the right side of Stevens's lot. No one from BFOA notified Stevens of the intent to erect the fence. And no one consulted with Stevens as to the placement of the openings in the fence.

E. Stevens's Counterclaims

In response to the suit and the fence, Stevens asserted several counterclaims against BFOA and the Owner Plaintiffs. He alleged BFOA and the Owner Plaintiffs had violated the 1997 CC&Rs by "clarifying" article 4(a) and amending article 5 through the adoption of article 5(g) to restrict his property rights (counterclaim 1).[16] He also contended BFOA and the Owner Plaintiffs violated the 1997 CC&Rs by erecting a spite fence blocking his access to the common

---

[16] Stevens voluntarily dismissed several counterclaims before the 2017 jury trial. The trial court dismissed other counterclaims on summary judgment that are not the subject of this appeal. The counterclaim numbering referenced here reflects Stevens's Fifth Amended Counterclaims, as that document is the most relevant for this appeal.

waterfront (counterclaim 2). He further asserted constructing the fence to block his access to the common waterfront was a violation of RCW 7.40.030[17] (counterclaim 3). Stevens also claimed BFOA and the Owner Plaintiffs further violated the 1997 CC&Rs because the changes to the 1997 CC&Rs and erection of the fence constituted a nuisance (counterclaim 7).

Stevens later added a counterclaim alleging BFOA and the Owner Plaintiffs had breached a duty of good faith toward him by amending articles 4(a) and 5(g), by adopting a series of unreasonable license agreements for renter waterfront access, and by constructing the fence (counterclaim 10). He also sought partition of the common waterfront based on the significant operational disagreements he had with the Owner Plaintiffs (counterclaim 11).

Finally, Stevens added a counterclaim alleging BFOA and its Board were violating the statute governing homeowner associations, chapter 64.38 RCW, in several different ways, including breaching fiduciary duties he claimed they owed to him (counterclaim 12).[18] This counterclaim 12, as modified over the course of the lawsuit, alleged statutory violations against only BFOA, "acting through its directors, and not against those directors individually or against [BFOA's] members."[19] Stevens alleged BFOA failed to give the required statutory notice of

---

[17] RCW 7.40.030 provides in pertinent part: "An injunction may be granted to restrain the malicious erection, by any owner or lessee of land, of any structure intended to spite, injure or annoy an adjoining proprietor."

[18] Stevens also alleged Baute had committed abuse of process in his litigation conduct toward Stevens and Stevens's attorneys and in attempting to use the lawsuit to force Stevens out of Bellevue Farm (counterclaim 13). Stevens voluntarily dismissed this claim in November 2017, after this court issued its decision in Bellevue Farm I. We do not address counterclaim 13 any further.

[19] The trial court granted Stevens's CR 41 motion to voluntarily dismiss any portion of counterclaim 12 that was based on the litigation conduct of BFOA or its Board.

all meetings, failed to make those meetings open to all Bellevue Farm lot owners, failed to keep minutes of all actions it took, failed to make its minutes and other records available to lot owners, and failed to make financial information available in a timely and organized manner. He also alleged BFOA failed to comply with its duties of good faith and fair dealing by, among other things, constructing a fence between his property and the common waterfront.

The trial court resolved the parties' claims and counterclaims through summary judgment orders, a 2016 bench trial, and a 2017 jury trial. The details of its decisions and the parties' arguments on appeal are addressed below.

## II. ANALYSIS

### A. BFOA Changes to Articles 4(a) and 5(g) of the 1997 CC&Rs

#### 1. Relevant Facts

Article 1 of the 1997 CC&Rs recognizes that Bellevue Farm is "a unique and irreplaceable parcel of land" with "exceptional natural beauty and unusual diversity." By purchasing a lot within Bellevue Farm, the owners agreed that the land is "desirable primarily for low density residential use and a wide variety of related rural and recreational activities." They also agreed that only designated portions of Bellevue Farm could be used for "certain commercial uses."

The purpose of the 1997 CC&Rs was to:

> a. Permit the broadest possible use of both individual lots and the common land for all the usual and desirable rural, recreational and residential activities which are not in conflict with a high degree of privacy and seclusion for individual Owners and which do not conflict with maintenance of the natural qualities and beauty of the area.

   b. Provide a reasonable basis for use of the common land for the fullest enjoyment of all the residential lot Owners.

   c. Maintain and enhance the material value and quality of [Bellevue Farm] of each individual lot Owner and all lot Owners collectively.

   d. Provide a reasonable means of allowing certain designated portions of [Bellevue Farm] to be used for commercial, multi-family and mixed uses while minimizing conflicts with the primary use of [Bellevue Farm] by single-family residential lot Owners.

Article 1 further provides, "Interpretation of specific provisions of these covenants shall be made in keeping with these general purposes."

Article 2 gives BFOA the authority to "[s]et reasonable rules for the use of the common land in keeping with these covenants and their general purposes." BFOA can levy annual assessments against each owner to cover the cost of maintenance and operation of the common facilities and roads. Every owner within the Bellevue Farm short plat is automatically a member of BFOA. Voting rights, consisting of 16 votes, are allocated among the various lots. The owner of BF Lots #1A and #1B, holds 2 votes. Stevens, as the owner of BF Lots #3A and #3B, is entitled to 4 votes. The owners of every other lot hold one vote each. The annual maintenance dues are similarly allocated. As a result, Stevens paid 25 percent of the homeowner association's annual assessments.

  a. <u>Renter Access to Common Waterfront under Article 4(a)</u>

Article 4 gave to each owner "an equal right to enjoyment of the common land" and access to a common dock. This right was subject to the restrictive covenants laid out in articles 4(a) through (e) and "such other rules as [BFOA] may prescribe from time to time." When adopted in 1997, article 4(a) provided:

Use of the common land and any common dock by guests who are actual house guests of Owners, or who are specifically accompanied by an Owner is permitted. Use of the common land and any common dock by persons not a guest in the household of an Owner, or not accompanied by an Owner or a member of an Owner's family, is not permitted. Lot Owners who have not built a house may not permit guests to make use of the common land or any common dock unless they are accompanied by the Owner, nor may they lease or rent their unimproved land for the purpose of conferring use of such facilities upon a third party.

At the July 5, 2012 special meeting, the owners approved, by a vote of 11 to 4,[20] a document entitled "Clarification of Article 4a of the Conditions, Covenants and Restrictions of the Bellevue Farm Owners' Association." This document provided:

WHEREAS Article 4a of the Bellevue Farm Owners' Association ("BFOA") Conditions, Covenants and Restrictions ("CCRs") states that the common waterfront land and common dock is reserved for use by owners and their actual house guests and visitors accompanied by owners, and further provides that paying tenants not accompanied by owners are not allowed to use the common waterfront land or the common dock;

WHEREAS one BFOA member, Chad Stevens ("Stevens") is operating a three home rental business . . . and Stevens has argued, erroneously, that Article 4a of the CCRs allows tenants the same unrestricted rights to use the common waterfront land and common dock as owners;

THE MEMBERS SIGNING BELOW WISH TO RESOLVE THE ISSUE QUICKLY, CHEAPLY AND INFORMALLY, WITHOUT HAVING TO SUE STEVENS, and believe that signing this document is the friendlier and more cost-effective way to end any controversy about the meaning of Article 4a, and thus, have signed below to indicate that sixty (60%) percent of BFOA's voting members have clarified Article 4a of the CCRs as follows:

Three new sentences are added to Article 4a of the CCRs, as follows: "As provided in the first two sentences of this Article 4a, the

---

[20] Article 11 of the 1997 CC&Rs authorizes amending the covenants by a vote of 60 percent of the authorized votes. With 16 total voting units, the amendment passed by more than the requisite 60 percent.

> common land . . . is not to be used by tenants . . . and is to be reserved for and used only by owners . . . . However, owners may seek permission from [BFOA] and its Board to be allowed to use a limited and specified area of the common waterfront, in the form of a written and signed revocable license agreement . . . . Tenants are not considered to be guests."

Straight recorded the amended 1997 CC&Rs with the county auditor on August 23, 2012.

The trial court denied, on summary judgment, Stevens's motion to invalidate the language that BFOA and the Owner Plaintiffs added to article 4(a). In an oral ruling, the court stated that article 4(a) did not impose a new or different restriction on Bellevue Farm owners. It concluded that the 1997 CC&Rs, as originally drafted, did not permit renters to use the waterfront because the article restricted that use to actual house guests or guests accompanied by an owner.

Stevens then sought to enjoin enforcement of the renter access restrictions pending trial, claiming the prohibition, to the extent it existed, had been abandoned by the owners over the years. He also argued BFOA and the Owner Plaintiffs should be estopped from seeking to enforce it against him because he had purchased BF Lots #3A and #3B based on representations of BFOA's then-president, Brad Augustine, that renter access to the waterfront was permissible.

In May 2013, after Baute confronted Stevens's attorney, who was staying in one of Stevens's residences, about walking unaccompanied on the common waterfront and subsequently verbally accosted some young children whose parents were renting Stevens's beach house, the trial court stayed BFOA's enforcement of clarified article 4(a) until it could rule on Stevens's abandonment and estoppel arguments. In August 2013, the court ruled that Stevens's renters

could use the common waterfront until all issues regarding article 4(a) were resolved, as long as Stevens maintained insurance covering his tenants' and guests' use of the property, provided the names of his renters to BFOA, and agreed to indemnify BFOA for any damages claimed by guests or tenants.

Two years later, BFOA and the Owner Plaintiffs moved to dismiss Stevens's abandonment and estoppel claims. Stevens filed a cross motion for summary judgment, arguing that even if the 1997 CC&Rs prohibited renter access to the waterfront parcel, equity did not allow BFOA or any of the Owner Plaintiffs to enforce this restriction under the doctrines of abandonment, equitable estoppel, and laches.

Stevens testified Brad Augustine, who sold BF Lot #3 to him, told him that renters could have unrestricted access to the waterfront parcel. Stevens claimed he had relied on these representations when deciding to purchase BF Lot #3. Brad Augustine, the author of the 1997 CC&Rs, confirmed he told Stevens that BF Lot #3 could be used for transient rentals when Stevens purchased the property. Brad Augustine testified that renters were quite rare before he left Bellevue Farm in 2005. Furthermore, he understood that the 1997 CC&Rs gave the owners the right to impose restrictions on renters' use of the waterfront if rentals became a problem.

Stevens provided declarations from several people who had rented property in Bellevue Farm over the years, all of whom testified they had used the waterfront area to dig clams, play in tide pools, fly kites on the beach, or walk the shoreline. Other renters stated they had been told by Brad or Web Augustine that renters

could use the waterfront without restriction.  Web Augustine confirmed he never told renters they could not use the waterfront.

But many of the renters saw no one other than members of their own party while there, and none of them had any interaction with any Bellevue Farm owners. This testimony was consistent with the testimony of the Owner Plaintiffs, many of whom testified they had only occasionally seen renters on the waterfront, or because the lots are so large and far apart from each other, and not all of the owners knew each other, they could not recognize someone as a renter or owner. Some owners testified they did not know the other owners well enough to know whether the people on the waterfront were authorized to be there or not.  For many who lived off island and were present infrequently, their knowledge of tenant usage was limited.  Anderson and Grosse, Hoopoe's owners, were not even aware that other lot owners were renting their homes to vacationers.

To be sure, some owners knew renters were using the waterfront.  These Owner Plaintiffs asked renters to leave the waterfront area or asked renters if they were house guests of any Bellevue Farm owner before asking them to leave.

Based on this factual record, the trial court issued a letter ruling granting the summary judgment motion brought by BFOA and the Owner Plaintiffs on September 22, 2015.  The court reasoned:

> It is undisputed that a few of the owners at Bellevue Farm[] have regularly rented out their properties during a few months each year and that, to some unknown extent, renters have been seen on the common area waterfront by at least a few of the other owners.  It is also undisputed that the majority of the owners have not rented their properties and were either unaware that Article 4(a) was being violated or were not sufficiently concerned to instigate an enforcement action until recently.  Despite that evidence the [c]ourt

is not persuaded that the history of non-enforcement of Article 4(a) manifests a subjective intent by the vast majority of the owners to abandon their rights under Article 4(a). The violations evidenced by Defendant's pleadings are not so substantial and habitual that the [c]ourt could fairly conclude that Article 4(a) has been abandoned. Nor does the [c]ourt believe that any reasonable and fair-minded finder of fact could do so.

The court concluded that, on that record, Stevens's defenses of abandonment, equitable estoppel, and laches failed. It entered its written summary judgment order, incorporating by reference its September 22, 2015 letter ruling.

### b. Permissible Commercial Agricultural Uses under Article 5

Article 5 restricts the activities in which individual private lot owners can engage. Unless authorized by article 6's provisions on commercial development, the individual lots are limited to private single-family use. Article 5(b) provides, "No commercial use of any residential lot will be permitted other than for agricultural purposes." When adopted in 1994 and amended in 1997, the CC&Rs did not define the phrase "agricultural purposes." But a conservation easement granted to the San Juan Preservation Trust in 1991 permitted "agricultural uses" and defined that term as:

> "Agricultural uses" shall be held to mean breeding, raising, pasturing, and grazing livestock of every nature and description; beekeeping; breeding and raising fish, poultry, and other fowl; planting, raising, harvesting, and producing agricultural, horticultural, and forestry crops and products of every nature and description; and the primary processing, storage and sale, including direct retail sale to the public, of crops and products harvested and produced principally on the Property.

Article 6 states, "except as specifically provided in Article 5 and this Article 6, no lot shall be used for commercial or multi-family residential purposes." However, article 6(a) allows the owner of BF Lot #1 to develop it for "commercial

or townhouse condominium residential purposes." The permitted commercial uses listed in the 1997 CC&Rs include retail, office, or a mix of such uses. And article 6(b) provides that a portion of BF Lot #3, can be "developed and used as a small, country inn-type restaurant with seating for no more than eighty-four (84) persons and/or a bed and breakfast facility."

When the Owner Plaintiffs became concerned about Stevens's plans for a commercial winery, Straight and Baute drafted a second proposed amendment to article 5 to add a new article 5(g). They left intact the provisions of article 6 permitting the previously designated permissible commercial activities on BF Lot #3. But they identified those agricultural purposes deemed to be consistent with the 1997 CC&Rs and the 1991 conservation easement and those deemed inconsistent and therefore impermissible for all Bellevue Farm lots:

> (i) Agricultural Purposes Consistent With These Covenants and with the Conservation Easement.
>
> The following agricultural purposes are allowed as a commercial use:
>
> 1. Breeding, raising, pasturing and grazing of livestock.
>
> 2. Beekeeping.
>
> 3. Planting, raising and harvesting fruits, vegetables and other agricultural crops that are grown on the Property. Such crops may be sold, but pick-up of home grown crops are to be done in the quietest way possible, so as to not disturb or annoy neighbors.
>
> 4. Breeding and raising fish, poultry and other fowl.
>
> 5. Maintaining a "home office" within a single family residence that does not involve retail customers on site. The only allowed retail sales are for crops grown on the Property, in a "farm stand" facing Roche Harbor Road not to exceed 400 square feet with proper sound reduction and privacy landscaping so that the "farm stand" is not visible to any neighbors.

6. Making hard cider or wine for consumption by a single Owner (not for retail sale to customers on site).

. . . .

(ii) Agricultural Purposes Which Conflict With These Covenants and Conflict With The Conservation Easement.

The following uses or activities are prohibited as a commercial use:

1. The retail sale of goods or services to customers on site (other than crops grown on the Property, sold via a "farm stand" via Article 5g(i)(5) above), which would bring cars, trucks, traffic and noise on to and in to a residential neighborhood which places a priority on privacy, quietude and seclusion.

2. The use of processing equipment or industrial equipment for the purpose of making alcoholic beverages for more than just personal consumption by the Owners. The sale of liquor, wine or alcohol on the Property is prohibited.

. . . .

5. The processing of crops, fruits and/or vegetables that were not grown on the Property . . . .

The proposed amendment also included several provisions restricting the size of any barn and its warehouse doors, restricting the size and number of any accessory dwelling units or guest quarters on the parcels, and setting noise limits.

At the August 4, 2012 special meeting, the Owner Plaintiffs voted to adopt this change by a 12 to 4 vote, with Stevens casting the 4 "no" votes. Corson recorded the amendment on August 24, 2012.

Stevens moved for summary judgment, contending that article 5(g) was invalid in its entirety because it placed new restrictions on the use of private property without the consent of all property owners as required by Washington case law. The court, in a February 6, 2013 oral ruling, concluded that the 1997

CC&Rs permit "amendments" with less than 100 percent of the property owners' approval but do not allow new restrictions to be imposed in that fashion. Article 5(g) included some new and different restrictions, such as the building height limitations, the location of any buildings, and the limits on noise levels. Based on the existence of a severability clause, the court struck these new provisions from article 5(g).

As to the other provisions of article 5(g), the court concluded that the prohibition on the sale of alcohol or the making of alcoholic beverages for resale was consistent with Bellevue Farm's original plan of development as laid out in the 1997 CC&Rs. It determined that the 1991 conservation easement did not grant to Stevens or any other property owner any rights; it merely set use limitations that the San Juan Island Preservation Trust could enforce. And the 1994 CC&Rs were more restrictive than the conservation easement, making it of little relevance in interpreting the restrictive covenants. The court granted in part and denied in part Stevens's summary judgment motion.

In the court's written summary judgment order, it attached a revision to article 5(g), deleting provisions it found to be void as a matter of law and modifying provisions to make them legally valid.[21] Article 5(g) now provides:

> g. Allowed and Prohibited Agricultural Purposes, and Uses and Activities that Are Not Agricultural. Article 1.a herein states that the primary purpose of these Covenants is to permit the use of individual lots for rural, recreational and residential activities which do not conflict with a high degree of privacy and seclusion for individual Owners. These Covenants also expressly acknowledge that the development restrictions and view protections of the August 22, 1991 Conservation Easement (the "Conservation Easement")

---

[21] No party challenged the trial court's changes to article 5(g).

- 33 -

bind the Property, which states that its purpose, in Section 1, is to "assure that the agricultural, wetlands and scenic values of the Property will be protected forever in their current condition", and to "prevent any use of the Property that will significantly impair or interfere with the conservation values of the Property", and to ensure the "protection of wetlands" and the "maintenance of views", and to prevent the "construction, occupancy and use of more than one (1) single-family residence and appurtenance" per lot. Further Article 5.b of these Covenants limits the commercial use of any lot solely to undefined agricultural purposes, and provides that there is to be no commerce conducted which involves the regular reception of customers on site and, similarly, no advertisements identifying any residential lot as a business location. Finally, Article 8 of these Covenants prohibits anything being done on an individual lot which becomes an annoyance or nuisance to the neighbors. Article 5 of these Covenants does not provide any definition or description of allowed or prohibited agricultural purposes. Accordingly, this new Article 5.g will allow and prohibit "agricultural purposes" consistent with these Covenants and the Conservation Easement, and will define what is not an agricultural purpose.

(i) Agricultural Purposes Allowed by and Consistent with these Covenants and with the Conservation Easement.

(a) The following farming, forestry and ranching uses are allowed for agricultural purposes:

1. Breeding, raising, pasturing and grazing of livestock on the Property;

2. Beekeeping;

3. Planting, raising and harvesting fruits, vegetables and crops that are grown on the Property; and

4. Breeding and raising fish, poultry and other fowl.

(b) The following uses may be done for agricultural purposes:

1. Making hard cider or wine as a recreational activity for personal consumption by the Owner;

2. [barn restrictions deleted by the court]

3. Maintaining a home office that does not involve retail customers on site; and

4. Sale of crops grown on the Property in their natural post-harvest condition (without processing) at a "farm stand." [remaining language regarding size and visibility to neighbors deleted by court]

(ii) The following are prohibited uses and are not allowed, and/or are not agricultural purposes:

(a) The sale of liquor, wine, beer, hard cider or other alcoholic beverages. Put simply, selling alcoholic beverages is not an agricultural purpose;

(b) The use of industrial, manufacturing or processing equipment for distilling or making wine, liquor, beer, hard cider or alcoholic beverages for sale. Making alcoholic beverages for resale is not an agricultural purpose;

(c) The processing or slaughtering of cattle, crops or livestock which were not raised or grown on the Property;

(d) [noise restrictions deleted by court]

(e) [warehouse door restrictions deleted by court]

(f) If an Owner seeks to include residential living quarters within or as part of a barn, appurtenance or agricultural building, then all Owners must adhere to these Covenants, and to the Conservation Easement. [remaining language regarding limits to dwellings on parcels deleted by court]

(iii) None of the provisions of this Article 5.g shall modify, change or limit the provisions of Article 6 of these Covenants. [remaining language regarding commercial use and sound restrictions deleted by court]

2. Standard of Review

Stevens challenges the trial court's summary judgment determinations regarding the validity of articles 4(a) and 5(g) of the 1997 CC&Rs. We review summary judgment orders de novo, performing the same inquiry as the trial court.

- 35 -

Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014).

A court may grant summary judgment if the evidence, viewed in a light most

favorable to the nonmoving party, establishes that there is no genuine issue of any

material fact and that the moving party is entitled to judgment as a matter of law.

CR 56(c); Wilkinson, 180 Wn.2d at 249.

Interpreting restrictive covenants is a question of law, and we employ rules

of contract interpretation to determine the drafter's intent, which is a question of

fact. Wilkinson, 180 Wn.2d at 249-50. "'[I]nterpretation of a particular covenant is

largely dependent upon the facts of the case at hand.'" Id. at 253 (quoting Mains

Farm Homeowners Ass'n v. Worthington, 121 Wn.2d 810, 827, 854 P.2d 1072

(1993)). Where the dispute is between homeowners who are jointly governed by

the covenants, "'[t]he court's goal is to ascertain and give effect to those purposes

intended by the covenants.'" Id. at 250 (quoting Riss v. Angel, 131 Wn.2d 612,

623, 934 P.2d 669 (1997)).

> In determining the drafter's intent, we give covenant language its
> ordinary and common use and will not construe a term in such a way
> so as to defeat its plain and obvious meaning. We examine the
> language of the restrictive covenant and consider the instrument in
> its entirety. The lack of an express term with the inclusion of other
> similar terms is evidence of the drafters' intent. Extrinsic evidence is
> used to illuminate what was written, not what was intended to be
> written. We, however, do not consider extrinsic evidence that would
> vary, contradict or modify the written word or show an intention
> independent of the instrument.

Id. at 250-51 (quotations, citations, and alterations omitted). This "context rule"

applies even when the disputed provision is unambiguous. Shafer v. Bd. of Trs.

of Sandy Hook Yacht Club Estates, Inc., 76 Wn. App. 267, 275, 883 P.2d 1387

(1994). Special emphasis is placed on "arriving at an interpretation that protects

the homeowners' collective interests." Wilkinson, 180 Wn.2d at 250 (internal quotation marks omitted) (quoting Riss, 131 Wn.2d at 623-24). "[W]here reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." Id.

### 3. Validity of Article 4(a)

Stevens argues the trial court erred in declaring article 4(a) valid. He relies on Wilkinson to argue that because the language added to article 4(a) imposed new restrictions on his property rights, a unanimous vote of BFOA members was legally required. We reject this argument because we conclude, as did the trial court, that BFOA did not impose new restrictions on renter access to the waterfront.

In Wilkinson, our Supreme Court addressed when homeowner associations may enact new restrictive covenants without unanimous approval of the homeowners. There, owners in the Chiwawa residential community had rented their homes to unrelated persons on a short-term, for-profit basis for decades without controversy. Id. at 247. As the number and frequency of rentals increased, a majority of the owners voted to make vacation rentals of less than one month a prohibited commercial use under the community's covenants. Id. at 247-48. The trial court ruled that the bar on short-term rentals was unenforceable. Id. at 248.

The homeowner association appealed, arguing that under the terms of its covenants, a majority of the owners could amend the covenants to prohibit short-term vacation rentals. Id. at 249. Our Supreme Court rejected that argument. The court recognized that an express reservation of power authorizing less than 100

percent of property owners to adopt new restrictions is valid, "'provided that such power is exercised in a reasonable manner consistent with the general plan of the development.'" Id. at 255-56 (quoting Shafer, 76 Wn. App. at 273-74). But "when the general plan of development permits a majority to change the covenants but not create new ones, a simple majority cannot add new restrictive covenants that are inconsistent with the general plan of development or have no relation to existing covenants." Id. at 256. It concluded that the prohibition on short-term rentals was unrelated to any existing covenant and could not be adopted by a simple majority vote. Id. at 256-57.

Under Wilkinson, the first question is whether the 1997 CC&Rs granted BFOA the power to adopt new restrictions unrelated to any existing covenants or simply to make changes to existing restrictions. If BFOA only has the power to change existing restrictions, the second question is whether the changes are consistent with BFOA's general plan of development and have a relation to existing covenants.

Article 11 of the CC&Rs provides, "These covenants may be amended at any time by a vote of sixty percent (60%) of the authorized votes." This language is almost identical to the provision at issue in Wilkinson, which the Supreme Court found insufficient to constitute an authorization to enact new restrictions unrelated to existing covenants. We therefore hold that article 11 permits only changes to existing covenants and does not authorize the enactment of new restrictions. Article 4(a), then, is valid only if it imposes no new restrictions unrelated to existing

covenants and the changes are consistent with BFOA's general plan of development.

We conclude the change made to article 4(a) did not impose new restrictions on Stevens or any other Bellevue Farm owners. Article 4 conferred on each owner the right to use the common waterfront. But that right was always subject to the limitations specified in articles 4(a) through (e) and article 4's express reservation for "such other rules as [BFOA] may prescribe from time to time."

The 1997 CC&Rs, the applicable restrictions when Stevens purchased BF Lot #3, limited use of the common waterfront and dock to "actual house guests" and "guest[s] in the household" of owners. And a "person" who is not a "guest in the household of an Owner" or "not accompanied by an Owner or a member of an Owner's family" may not use these common areas. Vacation renters clearly fall into this latter category because they are not actual house guests of an owner or guests in an owner's household. Adding language stating that a tenant is not an "actual house guest" is not the imposition of a new restriction. It is, as the Owner Plaintiffs argue, a mere clarification of a pre-existing prohibition.

Nevertheless, Stevens argues we must broadly construe the phrase "actual house guests" to include his paying short-term vacation renters. This argument is not textually based or based in common sense. We "impute an intention corresponding to the reasonable meaning of the words used. . . . [and,] generally[,] give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst

Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005).

Webster's defines "houseguest" as "a guest staying overnight or longer." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1096 (1993).[22]   "Guest" is primarily defined as "a person entertained in one's house or at one's table," or "a person to whom hospitality is extended," especially someone "invited to participate in some activity at the expense of another."  Id. at 1008; see also BLACK'S LAW DICTIONARY 852 (11th ed. 2019) ("Someone who is entertained or to whom hospitality is extended.").  The common meaning of the word "houseguest" does not include paying clients.

A guest can include "a person who lodges, boards, or receives refreshment for pay (as at a hotel, boardinghouse, restaurant) whether permanently or transiently."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1008.  A "guest in the household," however, has a completely different meaning.  A "household" includes individuals "who dwell under the same roof and compose a family."  Id. at 1096.  More specifically, it is a "social unit comprised of those living together in the same dwelling place."  Id.; see also BLACK'S LAW DICTIONARY at 888 (a "family living together," or a "group of people who dwell under the same roof").

Based on these definitions, "actual house guest" and "guest in the household," as those terms are used in article 4(a), are meant to differentiate vacation renters from family guests.  Article 4(a)'s plain language and intent always

---

[22] We cite to Webster's 1993 edition as that was the edition available when the 1997 CC&Rs were adopted.

protected the common areas for owners' use and for use by guests actually staying with the owners' families.

### 4. Stevens's Defenses of Abandonment, Estoppel, and Laches

Stevens next argues that if article 4(a)'s restriction on tenant use of the waterfront is a valid covenant, the trial court erred in rejecting his equitable defenses to enforcement of that covenant under the doctrines of abandonment, equitable estoppel, and laches. He contends there were genuine issues of fact warranting a trial on these equitable defenses. We reject this argument as well.

### a. Abandonment

Stevens argues that both BFOA, as a corporate entity, and the Owner Plaintiffs abandoned their right to prohibit renters from using the waterfront. He contends the deposition testimony of many of the Owner Plaintiffs and past renters demonstrates a history of non-enforcement of the prohibition, rising to the level of the abandonment of article 4(a)'s restrictions.

Property owners have a right in equity to enforce restrictive covenants. Mountain Park Homeowners Ass'n v. Tydings, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Article 9 of the 1997 CC&Rs explicitly provides that either BFOA or any individual owner may institute a lawsuit to enjoin non-compliance with the covenants. But a number of equitable defenses are available to prevent enforcement of a covenant, including abandonment, estoppel, and laches. Mountain Park, 125 Wn.2d at 341.

The defense of abandonment requires evidence that prior covenant violations have "so eroded the general plan as to make enforcement useless and inequitable." Id. at 342; see also Mt. Baker Park Club, Inc. v. Colcock, 45 Wn.2d

467, 471, 275 P.2d 733 (1954); Ronberg v. Smith, 132 Wash. 345, 352-53, 232 P. 283 (1925). "If a covenant applying to an entire tract has been habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant." Green v. Normandy Park Riviera Section Cmty. Club, 137 Wn. App. 665, 697, 151 P.3d 1038 (2007), amended on reconsideration (Apr. 6, 2007). But a few violations of covenants do not constitute abandonment. Peckham v. Milroy, 104 Wn. App. 887, 890, 17 P.3d 1256 (2001). "Violations must be material to the overall purpose of the covenant"; minor violations are insufficient to support abandonment. Mountain Park, 125 Wn.2d at 342.

Generally, whether evidence supports a finding of abandonment is a question of fact. Green, 137 Wn. App. at 697; see also White v. Wilhelm, 34 Wn. App. 763, 770, 665 P.2d 407 (1983) ("Applicability of [the abandonment] doctrine, which is based on estoppel, is a factual determination."). But at summary judgment, questions of fact may be determined as a matter of law when reasonable minds can reach only one conclusion. Miller v. Likins, 109 Wn. App. 140, 144, 34 P.3d 835 (2001).

Stevens presented evidence that the Owner Plaintiffs knew a few owners were renting their homes to vacationing families. He also presented evidence that Baute and Web Augustine did not restrict their renters' use of the waterfront until 2012. But it is undisputed that most of the Owner Plaintiffs who lived off island full time spent only a few days or weeks each year on Bellevue Farm. Many of the Owner Plaintiffs testified they infrequently visited the waterfront to monitor the

frequency of its use, or they had trees blocking their views of the waterfront, or they were too far away to observe who was strolling the waterfront. The Owner Plaintiffs stated they rarely saw anyone on the waterfront or when they did, they had no idea whether the individuals were family members, actual houseguests of owners, or paying tenants. And Anderson and Gross, the owners of Hoopoe, were not even aware that some of the owners were renting their property to vacationers.

Even if there was sufficient evidence to create a question of fact as to whether Baute and Web Augustine abandoned their right to enforce article 4(a), there is no evidence to suggest that any of the other Owner Plaintiffs did. Given that article 9 of the 1997 CC&Rs permits any of the owners to seek to enjoin violations, Stevens would have to establish that each and every Owner Plaintiff knew of and acquiesced in habitual violations by tenants. He did not do so here.

Stevens points to testimony from one or two Owner Plaintiffs who testified they considered tenant use of the waterfront a necessary evil and "let things slide." But their testimony also made it clear that what they observed was isolated in nature and occurred infrequently. These same Owner Plaintiffs, when they realized tenant use was increasing and interfering with their own use of the waterfront, sought to clarify article 4(a) to ensure that any ambiguity in how tenants could use the common areas was alleviated. Stevens failed to show that violations of article 4(a) between 1997 and 2012 were so prevalent, habitual, and substantial that they constituted an abandonment of article 4(a).

Stevens also argues BFOA effectively abandoned enforcement of article 4(a) when Brad Augustine, the former BFOA president, actively marketed the

waterfront to his renters and represented to future buyers, like Stevens, that their renters could use the waterfront. He maintains that regardless of whether those Owner Plaintiffs who bought their lots more recently were aware of violations, the knowledge, acts, and representations of BFOA's former president must be imputed both to BFOA and to all the Owner Plaintiffs as members of BFOA who authorized BFOA and its president to act on their behalf.

Stevens relies on Deep Water Brewing, LLC v. Fairway Res. Ltd., 152 Wn. App. 229, 215 P.3d 990 (2009), for the proposition that Brad Augustine's representations to Stevens and his non-enforcement of article 4(a) must be imputed to BFOA and to each individual Owner Plaintiff. We find Stevens's reliance on Deep Water Brewing to be misplaced.

In that case, a restaurant owner entered into an easement and right-of-way agreement with a developer in exchange for the developer's promise to restrict house heights to protect the restaurant's lake view. Id. at 238. The trial court found that the developer breached its agreement with the restaurant owner and that the developer's president and the homeowner association had tortiously interfered with the agreement. Id. On appeal, the court affirmed the imposition of liability against the president because he ignored provisions of the easement and right-of-way agreement by recording covenants that allowed house heights greater than the 16-feet he had promised to the restaurant owner. Id. at 266-67.

The court also affirmed the trial court's ruling that the homeowner association was jointly and severally liable for the tortious interference committed by the developer's president. Id. at 270. The court concluded that the homeowner

association had failed in its duty to evaluate building plans for compliance with the restrictions the developer had promised to the restaurant owner. Id. The homeowner association allowed lot owners to build homes in violation of that agreement and impaired the views from the restaurant. Id. Under those circumstances, the court concluded that the homeowner association was subject to joint and several liability to the restaurant owner. Id.

Deep Water Brewing did not address the issue of whether statements by a homeowner association president can constitute the abandonment of a restrictive covenant by the community as a whole or whether the president's non-enforcement of that covenant between 1994 and his departure from the community in 2005 (the year Brad Augustine sold his Bellevue Farm lot) can be imputed to Owner Plaintiffs who purchased their lots years later. We deem that case to be of little analytical help here.

Under these circumstances, we agree with the trial court that Brad Augustine's statement to Stevens that renters may use the waterfront cannot be imputed to the homeowners unless they were aware of the statement and took some action to indicate their subjective intent to abandon their right to enforce the 1997 CC&Rs. Under article 9 of the CC&Rs, "any person owning land in the subdivision" may prosecute a civil action against anyone for violating or attempting to violate the covenants. (Emphasis added.) As experts in Washington property law noted:

> While courts sometimes discuss abandonment of restrictive covenants in a subdivision, there are serious problems with applying such a theory. First, if a court really means abandonment, analogous to the doctrine of abandonment that we see in the law of chattels,

> then a subjective intent to abandon must be found. Indeed, subjective intent is usually the greatest stumbling block in finding abandonment of a chattel. Second, how could a covenant, created in a formally adopted and recorded subdivision plat, be relinquished by something so informal and amorphous as a wish that it not be enforced, implied by some number of departures from it? In the subdivision cases, it is hard to imagine that one could prove that the many (how many?) owners of lots in a subdivision had subjectively intended to abandon the covenant. Subdivision covenants may be terminated by agreement if the owners of lots burdened and benefited by them agree to terminate them—but, in the absence of a covenant allowing termination by a smaller percentage, all must agree. Why, then, should it not require an "abandonment" by all owners to work termination by abandonment?

17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 3.8, at 144-45 (2004). In the analogous context of an alleged abandonment of an easement, the act evidencing abandonment must be "unequivocal and decisive and inconsistent with the continued existence of the easement." Heg v. Alldredge, 157 Wn.2d 154, 161, 137 P.3d 9 (2006). Nonuse, in the easement context, is not proof of an intent to abandon. Id.

The same standard of proof to establish abandonment of a restrictive covenant on a commonly owned parcel should apply here. An easement is a property right that gives its holder limited rights to use, but not to possess, the owner's land. Admasu v. Port of Seattle, 185 Wn. App. 23, 36, 340 P.3d 873 (2014). The 1997 CC&Rs grant property rights to Bellevue Farm lot owners that confer to each owner the right to use the common waterfront parcel. Indeed, Stevens and the Owner Plaintiffs all hold an ownership interest in the common waterfront, a property right conferring more rights than an easement. Because Stevens seeks to eliminate a significant property right—the right to exclude others

from the common waterfront—we conclude that proof of abandonment must rise to the same level as evidence of abandonment of an easement.

Under this formulation of the abandonment defense, mere non-enforcement of article 4(a)—analogous to nonuse of an easement—would be insufficient as a matter of law. Instead, Stevens must have proof that each of the Owner Plaintiffs took an unequivocal and decisive act inconsistent with the existence of a restriction on renter access to the waterfront. Brad Augustine's representations to prospective owners become irrelevant unless those owners, like Stevens, affirmatively granted unrestricted access to paying tenants.

With perhaps the exception of Baute and Web Augustine, Stevens's evidence did not meet this test. While most of the Owner Plaintiffs knew Stevens, Baute, and Web Augustine were renting their homes to short-term vacationers and some of them saw people on the waterfront who may have been renters, the evidence does not show that all of them took an unequivocal and decisive step to forgo their rights under article 4(a). Indeed, Stevens conceded below that Hoopoe did not abandon its rights to enforce article 4(a). Summary judgment on this defense was appropriate.

b. Equitable Estoppel

Stevens argues, alternatively, that BFOA and the Owner Plaintiffs should be estopped from enforcing tenant restrictions in article 4(a) because former BFOA president Brad Augustine represented to him that tenants were permitted access to the common waterfront.

Courts do not favor equitable estoppel, and the party claiming estoppel must prove each of its elements by clear, cogent, and convincing evidence. Wilhelm v. Beyersdorf, 100 Wn. App. 836, 849, 999 P.2d 54 (2000). "Equitable estoppel is based on the notion that 'a party should be held to a representation made or position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon.'" Lybbert v. Grant County, 141 Wn.2d 29, 35, 1 P.3d 1124 (2000) (quoting Wilson v. Westinghouse Elec. Corp., 85 Wn.2d 78, 81, 530 P.2d 298 (1975)). Stevens must demonstrate (1) BFOA or the Owner Plaintiffs made an admission or statement, or committed an act inconsistent with the claim they are now asserting; (2) he reasonably relied on BFOA's or the Owner Plaintiffs' admission, statement, or act; and (3) he would be injured if BFOA or the Owner Plaintiffs are allowed to contradict or repudiate the admission, statement, or act. Wilhelm, 100 Wn. App. at 849.

Again, even if Brad Augustine's statements can be imputed to BFOA, Stevens has not demonstrated how those statements can be imputed to every Owner Plaintiff, including many who purchased property in Bellevue Farm after Brad Augustine left the community. The trial court properly struck the equitable estoppel defense on summary judgment.

### c. Laches

Lastly, Stevens contends the trial court erred in rejecting his laches defense. "'Laches consists of two elements: (1) inexcusable delay and (2) prejudice to the other party from such delay.'"[23] United Trades Org. v. State, 175 Wn.2d 537, 542,

---

[23] Earlier versions of laches included a third element—"knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant." United

286 P.3d 377 (2012) (quoting State ex rel. Citizens Against Tolls v. Murphy, 151 Wn.2d 226, 241, 88 P.3d 375 (2004)). Laches is based on estoppel. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme NW, Inc., 168 Wn. App. 56, 76, 78, 277 P.3d 18 (2012). The "main component of laches is prejudice to the other party." Murphy, 151 Wn.2d at 241. Prejudice is not presumed; rather, Stevens bears the burden of showing "whether and to what extent he . . . has been prejudiced by the delay." Clark County Pub. Util. Dist. No. 1 v. Wilkinson, 139 Wn.2d 840, 849, 991 P.2d 1161 (2000). Laches must be proved by clear and convincing evidence. Arnold v. Melani, 75 Wn.2d 143, 148, 449 P.2d 800 (1968).

Stevens argues he has allowed renters to use the waterfront since 2005 and the Owner Plaintiffs waited six years to enforce article 4(a). He contends the delay was inexcusable and prejudicial because he is now prohibited from renting to people who want a waterfront vacation experience—"the very reason that he purchased the property in the first place."

But this argument is based on the same erroneous premise as his abandonment and estoppel defenses—that anything former-president Brad Augustine told Stevens in 2005 has to be imputed to all of the Owner Plaintiffs. There is no legal basis for such an imputation.

Additionally, at least three Owner Plaintiffs purchased their Bellevue Farm lots four to five years after Stevens purchased his lot. Hoopoe bought its property in 2009; the Dohertys bought their property in 2010, and the Kuppermanns

---

Trades Org., 175 Wn.2d at 542 n.3 (quoting Buell v. City of Bremerton, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972)).

purchased their property in 2009.  Furthermore, it was undisputed that tenant use of the waterfront area was infrequent until around 2011 when many realized that tenant traffic may increase as a result of construction of large homes by Baute and Kupperman on BF Lot #2B and Stevens's construction of a large beach house on BF Lot #3B.  Laches "cannot apply where a plaintiff has no reason to believe that legal action is necessary."  Newport Yacht Basin, 168 Wn. App. at 79.  The evidence does not create a genuine issue of fact that each of the Owner Plaintiffs had a reason to believe it necessary to bring an enforcement action any earlier than September 2012.  We conclude the trial court did not err by rejecting Stevens's laches defense.  Accordingly, we conclude the clarification to article 4(a) is valid and enforceable.

5. Permissible Commercial Agricultural Activities under Article 5(g)

Stevens contends the trial court erred in validating article 5(g)'s prohibition on the manufacture and sale of alcoholic beverages, arguing that the prohibitions are new restrictions that cannot be imposed absent unanimous consent of all homeowners.  We conclude article 5(g) is enforceable because it relates to pre-existing covenants and is consistent with Bellevue Farm's general plan of development.

First, the 2012 amendment explicitly referenced multiple related covenants—article 1(a)'s statement of the covenants' primary purpose to allow rural uses not conflicting with owners' privacy and seclusion; article 7's requirement that owners comply with the terms of the 1991 conservation easement and limit construction to one single-family residence per lot; article 5(b)'s limitation

on commercial uses other than for agricultural purposes; and article 8's prohibition on annoyances and nuisances.

Specifically, article 5(b) provided:

> No commercial use of any residential lot will be permitted other than for agricultural purposes. However, use of the property for business purposes (such as a home office) shall not be considered commercial use provided the work does not involve the regular reception of business clients and provided that the residence location shall not be advertised in any fashion as the business location of such person.

Article 5(g) clearly related to article 5(b) because it defined what is and is not a permissible agricultural purpose. Stevens conceded this point below.

Second, article 5(g) is consistent with Bellevue Farm's general plan of development. The primary purpose, as set out in article 1 of the 1997 CC&Rs, is to ensure the privacy and seclusion for the owners living there. Article 5(a) provides that, unless specifically authorized in article 6, the use of individual lots is limited to private, single-family residential use. Article 6 states that no lot may be used for commercial purposes, except for certain specified permissible commercial activities on BF Lot #1, belonging to Hoopoe, and BF Lot #3, belonging to Stevens. Article 6(b) provides:

> Lot 3. That portion of Lot 3 of the Bellevue Farm Short Plat comprising approximately two (2) acres . . . may be developed and used as a small, country inn-type restaurant with seating for no more than eighty-four (84) persons and/or a bed and breakfast facility. Such development and use shall be consistent with the type and quality of similar facilities in the area, such as the Duck Soup Restaurant on Roche Harbor Road.[24]

---

[24] https://www.ducksoupsanjuans.com/.

There is nothing in article 6 permitting the construction and operation of a commercial hard cider or alcohol manufacturing facility or distillery on BF Lot #3.

Stevens contends that article 5(b) permitted him to use his property for any "agricultural purpose" and that making and selling hard cider and wine is such an agricultural purpose. But this argument ignores article 5(b)'s explicit prohibition on any commercial use that involves the "regular reception of business clients" or the advertising of a business location on that property. It is difficult to see how a commercial winery or distillery could operate and abide by these restrictions. It also ignores the explicit description of the only type of commercial activity deemed appropriate for BF Lot #3—a small restaurant or a bed and breakfast facility.

Stevens next argues his use of the property as a winery or distillery is permissible under the 1991 conservation easement. The easement defines permissible "agricultural uses" as including the "primary processing, storage, and sale," and the "direct retail sale to the public, of crops and products harvested and produced principally" on Bellevue Farm. One could argue that making hard cider or wine is not the "primary processing" of apples or grapes and, thus, not permissible under the conservation easement. But we need not reach that issue here because the Bellevue Farm short plat, recorded after the 1991 easement, expressly provided that "[i]f any private deed restrictions are in conflict with the restrictions which appear on the plat map, the more restrictive provisions shall govern." Nothing prevented BFOA from defining permissible agricultural uses more narrowly than defined in the easement, and under the terms of the short plat, the more restrictive provisions apply.

Unlike the prohibition on short-term rentals in <u>Wilkinson</u>, article 5(g)'s provisions defining permissible and impermissible agricultural activities are not unrelated to pre-existing covenants and are consistent with the general development plan for Bellevue Farm. Article 5(g) was thus validly adopted by majority vote, making it permissible under <u>Wilkinson</u>. <u>See</u> 180 Wn.2d at 255-57.

B. <u>Partition of the Common Waterfront</u>

1. <u>Relevant Facts</u>

Stevens asked the trial court to partition the common waterfront so that each Bellevue Farm owner received fee title to some portion of that parcel. Stevens argued that because he owned a 25 percent interest in Bellevue Farm's common waterfront parcel as a tenant in common with other owners, he had an absolute right to partition under RCW 7.52.010. The trial court rejected this argument, concluding that while the waterfront common area is owned by Bellevue Farm owners as tenants in common, the owners accepted title with full knowledge that the 1997 CC&Rs precluded partition.

2. <u>Standard of Review</u>

RCW 7.52.010 permits any person holding real property as tenants in common to bring an action for partition of the land in kind or for partition by sale if "partition cannot be made without great prejudice to the owners." A partition action is an equitable action. <u>Kelsey v. Kelsey</u>, 179 Wn. App. 360, 365, 317 P.3d 1096 (2014). Because a trial court has broad discretion and great flexibility to determine whether partition is appropriate, we review an order denying partition for abuse of discretion. <u>Friend v. Friend</u>, 92 Wn. App. 799, 804-05, 964 P.2d 1219 (1998).

3. Analysis

Stevens argues the trial court erred in denying him the right to partition the waterfront because his right to partition is absolute. This argument was firmly rejected by our Supreme Court in Carter v. Weowna Beach Community Corp., 71 Wn.2d 498, 429 P.2d 201 (1967). In that case, the original grantor split the first tract into 81 residential lots (Tract 1), and deeded to each residential lot owner an undivided share in a second tract (Tract 2). Id. at 499. The deeds provided that Tract 2 and the grantees' interests in it were subject to covenants, reservations, and restrictions requiring Tract 2 be used as a private community park and watershed. Id. at 499-500.

Several decades later, Carter filed a partition action against the other landowners and the Weowna Beach Community Corporation, seeking the sale of Tract 2. Id. at 501. At the conclusion of Carter's case-in-chief at trial, the court dismissed his partition action, concluding that the sale of Tract 2 "free and clear of deed restrictions would be inconsistent with the intention of the original grantor, and would be contrary to the deeded interests of the purchasers to use the entire tract subject only to the rights of the 80 others to use it similarly." Id.

The Supreme Court affirmed, holding that partition in kind was improper because the printed deeds were clear and unambiguous in expressing the grantor's intent that the park be held in common for the use of all owners and that the purchasers understood their right in the land on which the park was built was subject to the rights of the other purchasers to use it at the same time. Id. It further held that partition by sale was similarly improper:

> The right to sale, as a remedy guaranteed by statute, is not absolute in all cases of partition. It is not available where a cotenant, by his own acts, is estopped or has waived his right by express or implied agreement; or where his cotenant's equitable rights will be minimized or defeated; or in violation of a condition or restriction imposed upon the estate by one through whom he claims.

Id. at 502 (citations omitted). The court concluded that because Carter purchased his property with full knowledge of the rights and privileges held by the other owners within the community, he could not claim the right to partition in a manner that would destroy those rights.

Carter is analogous to this case. At the time Bellevue Farm was created, the San Juan County Code Chapter 16.40 Shoreline Master Program[25] (Ordinance No. 161-1976) provided:

> All waterfront subdivisions should include provision for common shoreline area. Common area should be provided at least from the line of ordinary high tide to the top of the bank. If tidelands are privately owned they should be included in common area. Access to common area should be provided to all lot owners.

Pursuant to this program, the Bellevue Farm short plat's dedications declared that "the shoreline common area shall be owned in common by all owners of lots within the plat," and the plat map expressly identified the common area of the waterfront. The short plat also contained beach access restrictions:

> Any future application for a dock, other moorage structure, and/or access to the beach, shall provide for the common ownership and use by all lot owners. . . . If a moorage facility and/or access to the beach is approved by the county, all lot owners shall hold an undivided interest in the facility. . . .

And article 4 of the 1997 CC&Rs provides:

---

[25] The Shoreline Master Program is now recodified as Chapter 18.50.

Each lot Owner shall have an equal right to enjoyment of the common land shown on the face of the plat and to access any common dock, and such right shall be appurtenant to and pass with the title of each lot. Said right shall be subject to the following covenants, and such other rules as [BFOA] may prescribe from time to time[.]

Stevens purchased BF Lot #3 subject to these restrictions. He took title to BF Lot #3 pursuant to a statutory warranty deed. The deed was explicitly made "[s]ubject to covenants, conditions and restrictions of record" described in an attached exhibit. Included in the exhibit list were the 1997 CC&Rs and the provisions set out in the dedication of the Bellevue Farm short plat.

This record is essentially undisputed. At the inception of Bellevue Farm, the clear intent was to set aside the waterfront for the use of all owners within the community. Stevens purchased BF Lot #3 with full knowledge of the rights and privileges that his fellow Bellevue Farm owners have in the waterfront. Partitioning the common waterfront now would destroy the rights of these owners, contravene the short plat's declaration of intent, and violate article 4's restriction of equal use and enjoyment.

Stevens argues that even if a partition in kind could cause substantial prejudice to the Owner Plaintiffs, the court could ameliorate that prejudice by granting the Owner Plaintiffs an easement over any portion of the waterfront granted to Stevens. But we see no abuse of discretion in the trial court's rejection of this proposal. Owners may agree not to partition land for a reasonable period of time. Schultheis v. Schultheis, 36 Wn. App. 588, 590-91, 675 P.2d 634 (1984). Here, in the 1997 CC&Rs, the parties agreed to maintain the common ownership of the waterfront parcel for a period of 25 years. Under Carter, courts may enforce

this agreement and refuse to partition in kind or by sale when the doing so would contravene restrictions imposed in deeds, short plats, and restrictive covenants. The trial court did not err by dismissing Stevens's partition claim.

C. <u>Stevens's Motion to Disqualify Counsel for BFOA and the Owner Plaintiffs and the Order Sealing Conflict Waivers</u>

1. <u>Relevant Facts</u>

In October 2015, Stevens moved to disqualify the attorneys who represented both BFOA and the Owner Plaintiffs.[26] Stevens contended his claims created a non-waivable conflict of interest such that joint representation was impermissible under the Rules of Professional Conduct (RPC). The trial court denied Stevens's motion to disqualify counsel after an in camera review of written conflict waivers executed by BFOA's Board and the Owner Plaintiffs. The trial court subsequently granted a motion to seal the conflict waiver letters. The court found that the conflict waivers were protected by the attorney-client privilege; that the public had no interest in seeing these documents; that under GR 15(c) and <u>Seattle Times Co. v. Ishikawa</u>, 97 Wn.2d 30, 640 P.2d 716 (1982), BFOA and the Owner Plaintiffs had a compelling interest in protecting their privileged communications; and that the Owner Plaintiffs' interest outweighed any public interest in access to those communications. The court further found that redacting the documents would not ensure that privileged information was fully protected.

---

[26] Hoopoe retained separate counsel in May 2013.

2. Standard of Review

Stevens challenges the trial court's denial of his motion to disqualify and its decision to seal, rather than redact, the conflict waivers. We review de novo a court's decision to grant or deny a motion to disqualify counsel. Plein v. USAA Casualty Ins. Co., 9 Wn. App. 2d 407, 412, 445 P.3d 574, review granted, 194 Wn.2d 1009, 452 P.3d 1233 (2019). We also review de novo a determination whether an attorney has violated the RPC. Id. A trial court's decision to seal records is reviewed for abuse of discretion. Dreiling v. Jain, 151 Wn.2d 900, 907, 93 P.3d 861 (2004).[27]

3. Analysis

a. Disqualification

Stevens argues the trial court should have disqualified the attorneys who represented both BFOA and the Owner Plaintiffs because there was a non-waivable conflict of interest between these parties. We conclude Stevens lacked standing to seek disqualification of counsel.

"[T]he majority, if not universal, rule is that only a party who has been represented by the conflicted attorney has standing" to seek disqualification of that attorney. Burnett v. Dep't of Corr., 187 Wn. App. 159, 170, 349 P.3d 42 (2015). "The standing rule draws its strength from the logic of the rule itself, which is designed to protect the interests of those harmed by conflicting representations rather than serve as a weapon in the arsenal of a party opponent." Id. The

---

[27] Whether the court used the proper standard governing the sealing of records is a legal question we review de novo. Bennett v. Smith Bundy Berman Britton, PS, 176 Wn.2d 303, 307, 291 P.3d 886 (2013). Stevens does not contend the trial court used an incorrect legal standard in evaluating whether to seal these conflict waivers.

attorneys representing BFOA and the Owner Plaintiffs never represented Stevens. Accordingly, he did not have standing to bring a motion to disqualify, and the trial court did not err in denying the motion.

### b. Sealing Conflict Waiver Letters

Stevens maintains the trial court erred in sealing, rather than redacting, attorney-client communications in the conflict waiver letters that BFOA and the Owner Plaintiffs executed.[28]

Article I, section 10 of our state constitution requires that "[j]ustice in all cases shall be administered openly." Hundtofte v. Encarnación, 181 Wn.2d 1, 7, 330 P.3d 168 (2014). Under GR 15(c)(2), a court may seal records filed with that court if it enters written findings that the specific sealing is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court records. Our Supreme Court has held that to comply with article I, section 10, courts must analyze a motion to seal under GR 15(c)(2) and the five-step framework for evaluating a courtroom closure under Ishikawa. Hundtofte, 181 Wn.2d at 7.

First, the party seeking to seal court records must show a need. Id. at 8. If sealing is meant to protect a right other than the right to a fair trial, the proponent must show a "serious and imminent threat to some other important interest." Id. (quoting Ishikawa, 97 Wn.2d at 37). In this case, BFOA and the Owner Plaintiffs

---

[28] BFOA and the Owner Plaintiffs contend Stevens did not preserve this issue for appeal because he did not designate the trial court's order granting the motion to seal in his notice of appeal. Under RAP 2.4(a), Stevens did not need to designate that order in his notice of appeal if "the order or ruling prejudicially affects the decision designated in the notice." We choose to reach the merits of the sealing order because the documents were clearly important to the trial court's decision on the motion to disqualify counsel, which Stevens designated in his notice of appeal.

demonstrated that the documents—letters from trial counsel to their clients—constituted attorney-client privileged communications and that disclosure of these communications would jeopardize their litigation strategy. The threat of losing this privilege was serious and imminent.

Second, anyone present when BFOA and the Owner Plaintiffs moved to seal documents must be given an opportunity to object. Id. The trial court afforded Stevens, and any member of the general public present at the hearing, this opportunity.

Third, the court and the parties must analyze whether sealing is both the least restrictive means available and effective in protecting the interests threatened. Id. (quoting Ishikawa, 97 Wn.2d at 38). The court undertook this analysis when it rejected Stevens's request to redact rather than seal the documents in their entirety:

> The public's interest, other than the fact that they always have some interest, that's the whole point of the constitution[al] provision. Other than that for these particular documents, I see no unique specific individualized need on the part of the public to see this.

> On the other hand, I see a great need to protect what's in these documents from the defendants having access to it. And while some of this information might be appropriate to be allowed to be seen by going through a redaction, in this case, given the way this case has gone, I would be unable to confidently go through these documents and think that I could redact them in a way that what was unredacted would not in some fashion be used in a way that it shouldn't be used. That's just the way this case has gone.

In its written order, the court concluded, "Because the documents contain attorney-client privileged information, redacting the documents would not assure [BFOA and

the Owner Plaintiffs] that privileged information has been fully protected." The record supports this conclusion.

Stevens argues that the identity of the individuals signing the conflict waivers and the dates on which they each signed is not information protected by the attorney-client privilege. The identity of an attorney's client is generally not privileged information. State v. Mendez, 157 Wn. App. 565, 585, 238 P.3d 517 (2010). But each client submitted a signed declaration under oath in which they informed the court and Stevens that they had been advised of potential conflicts of interest regarding the joint representation, did not believe a conflict existed, and had signed waivers on three separate occasions. They identified the dates on which they each signed the waivers. The clients' identities are in the record, unsealed, at the end of the declarations. In light of this record, it is unclear how Stevens was harmed by the trial court's decision not to disclose the individuals' signatures as they appear on the waiver forms.[29]

Fourth, the court must weigh the competing interests of the party seeking sealing and the public, and it must consider alternative methods to protect that interest. Hundtofte, 181 Wn.2d at 8. The court conducted this weighing process and held, in its written order, that "the compelling interest in protecting [BFOA's and the Owner Plaintiffs'] privileged communications far outweighs any public interest in access to those communications."

---

[29] Stevens also argues the order sealing the conflict waivers precluded him from verifying that BFOA, the corporate entity, properly waived any conflict of interest. Given that Stevens lacks standing to challenge any joint representation, we need not address this argument. We note, however, that there is a conflict waiver executed by BFOA Board members in the record.

- 61 -

Finally, the order should be no broader than necessary to protect the interest involved. Id. "If the order involves sealing of records, it shall apply for a specific time period with a burden on the proponent to come before the court at a time specified to justify continued sealing." Ishikawa, 97 Wn.2d at 39. The order in this case does not contain any such time deadline. But Stevens does not argue that the court erred in failing to specify an end date to the order. Given the unique nature of attorney-client privileged communications, these communications retain their privileged status unless or until affirmatively waived by the clients themselves. It was thus within the trial court's discretion to not specify an end date in the order. We conclude the trial court did not abuse its discretion in sealing the written conflict waiver forms signed by BFOA and the Owner Plaintiffs.

D. Stevens's Claims under Chapter 64.38 RCW

1. Relevant Facts

Stevens alleged 10 separate violations of chapter 64.38 RCW by BFOA and its Board. The trial court conducted a bench trial on these 10 claims and, in its written findings of fact and conclusions of law, ruled in BFOA's favor in whole or in part on most of these allegations.

Relevant to this appeal, the trial court concluded that BFOA and its Board did not violate either RCW 64.38.020 or 64.38.025(1) by delegating authority to Corson, the homeowner association president, to conduct BFOA business without prior direction or authorization from the Board. With regard to the installation of the fence, the court found that in September 2012, Corson arranged for and directed the installation of a fence along the boundary line between Stevens's

property and the common waterfront parcel. He took this action after BFOA members and BFOA's attorney discussed the matter with him during, and immediately following, the August 2012 special meeting of the membership. There was no formal vote by the membership to install the fence, but a majority of the members agreed with BFOA's attorney that the fence was advisable. Corson, in reliance on the direction he received from the members and BFOA's attorney, arranged to have the fence installed. The trial court explicitly found that the installation of the fence was the act of BFOA's members, and not the action of BFOA's directors. Stevens did not assign error to any of these findings and we, therefore, accept them as true on appeal. See RAP 10.3(a)(4).

Based on these findings, the court concluded that BFOA had no liability under RCW 64.38.025(1) for the installation of the fence because that statute did not apply to decisions made by the corporation or by individual association members. It further concluded the statute did not require officers and directors to control decisions made by the members. Because Stevens asserted his statutory claims against only BFOA—and not against any member or individual director—and it was the members and not the directors who decided to erect the fence, the court concluded Stevens failed to establish that a director violated any duty imposed under RCW 64.38.025(1).

### 2. Standard of Review

When we evaluate evidence in a bench trial, our review is limited to determining whether substantial evidence supports any findings properly challenged on appeal and whether the findings support the conclusions of law.

Jensen v. Lake Jane Estates, 165 Wn. App. 100, 104, 267 P.3d 435 (2011).  We accept the unchallenged findings as true on appeal.  Id. at 105.  All reasonable inferences are reviewed in the light most favorable to the prevailing party, in this case, BFOA.  Id. at 104.  Questions of law are reviewed de novo.  Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

       3.  Analysis

          a.  Stevens's Alleged Violations of RCW 64.38.025(1)

Stevens argues the trial court erred when it failed to conclude that BFOA violated RCW 64.38.025(1) when BFOA allowed Corson to build the fence along Stevens's property line.  But Stevens's argument is based on a misinterpretation of this statute.

Homeowner association directors must exercise the same degree of care and loyalty as an officer or director of a non-profit corporation under chapter 24.03 RCW.  Riss, 131 Wn.2d at 632 n.5; see also RCW 64.38.025(1) ("In the performance of their duties, the officers and members of the board of directors shall exercise the degree of care and loyalty required of an officer or director of a corporation organized under chapter 24.03 RCW.").  RCW 24.03.127 provides that a director shall perform the duties of a director "in good faith, in a manner such director believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."  These statutes define the duties that individual corporate directors owe to the corporation and to its members.  Waltz v. Tanager Estates Homeowners Ass'n, 183 Wn. App. 85, 91, 332 P.3d 1133 (2014).

Therefore, the trial court correctly concluded that RCW 64.38.025(1) does not impose any obligation or duty on BFOA, the corporation.

Stevens did not allege at trial that any individual director violated RCW 64.38.025(1). Instead, he chose to allege that BFOA, the corporation, violated this statute by installing the fence along his boundary line without any lawful justification for doing so. Stevens argues on appeal that Corson, as the homeowner association's president, violated a duty he owed to Stevens when he erected the fence and that Corson's liability under RCW 64.38.025(1) should be imputed to BFOA because Corson acted as BFOA's agent. Certainly, under general tort law principles, the tortious conduct of an agent may be imputed to the principal. City of Vancouver v. Pub. Emp't Relations Comm'n, 180 Wn. App. 333, 351-52, 325 P.3d 213 (2014). But this argument was not advanced below. Under RAP 2.5(a), we generally will not consider arguments raised for the first time on appeal. Cameron v. Atl. Richfield Co., 8 Wn. App. 2d 795, 811, 442 P.3d 31 (2019). We decline to review this claim here.

The trial court correctly concluded that BFOA was not liable under RCW 64.38.025(1) for the construction of the fence along Stevens's boundary with the common waterfront.

### b. Stevens's Alleged Violations of RCW 64.38.035(4)

Stevens also argues the trial court erred in rejecting his claim that BFOA violated RCW 64.38.035(4)'s notice and meeting requirements by failing to notify Stevens of the Board's intent to delegate to Corson the authority to construct the boundary line fence.

- 65 -

RCW 64.38.035(4) requires a homeowner association board to conduct all board of director meetings in the open for observation by all homeowners. If the board wishes to meet in a closed session to take a vote on any issue, the board must notify the homeowners of its intention to do so and state the purpose for the closed session. If the board of directors holds a closed session, it must limit its discussion to the topics set out in the notice to homeowners. No motion approved in closed session is effective until the board reconvenes in open session and votes in open session.

Stevens contends BFOA effectively acted in "closed session" by authorizing Corson to erect the fence along his boundary line and, in doing so, violated the open meeting requirement of RCW 64.38.035(4). The trial court disagreed, concluding BFOA did not violate any open meeting requirement in the statute. It based this conclusion on its finding that the Board simply did not meet, in either open or closed session, in the years 2010 to 2013. And while the failure to meet as a Board at least once annually violated BFOA's bylaws and therefore violated RCW 64.38.025(1), it did not violate RCW 64.38.035(4)'s requirements by failing to meet on any other occasion.

We reject Stevens's contention that BFOA violated RCW 64.38.035(4) by failing to hold a board meeting to discuss erecting the fence. The trial court found that this small homeowner association had a practice of allowing the president to conduct all of BFOA's business without prior affirmative direction or authorization from the Board. It concluded that BFOA's bylaws expressly provided for this delegation of authority. And the court explicitly found that the Owner Plaintiffs, not

the Board, decided they wanted a boundary fence installed. Stevens did not challenge these factual findings or legal conclusions. The trial court did not err in rejecting Stevens's argument that BFOA's directors should have held a meeting before allowing Corson to erect the fence. Accordingly, we uphold the trial court's conclusion that the Board did not violate the notice and meeting requirements of RCW 64.38.035(4).

### E. Hoopoe's Award of Attorney Fees

#### 1. Relevant Facts

On November 20, 2015, Hoopoe moved to dismiss Stevens's counterclaims against it. The trial court granted the motion on March 26, 2016, awarding Hoopoe $114,600.95 in attorney fees and $1,177.33 in costs on August 11, 2016. Stevens does not challenge the dismissal of his claims against Hoopoe but argues the trial court erred in awarding attorney fees to Hoopoe.

#### 2. Standard of Review

Whether a party is entitled to an award of attorney fees is a question of law reviewed de novo on appeal. Durland v. San Juan County, 182 Wn.2d 55, 76, 340 P.3d 191 (2014). The general rule in Washington is that attorney fees will not be awarded for costs of litigation unless authorized by contract, statute, or a recognized ground in equity. Id. The trial court deemed Hoopoe legally entitled to an award of attorney fees under article 9 of the 1997 CC&Rs[30] and RCW

---

[30] Article 9 of the 1997 CC&Rs provides that BFOA or any person owning land in Bellevue Farm may prosecute a civil action against another for violating or attempting to violate any covenants. Any party bringing such an action is "entitled to recover from the violator all attorney fees, court cost and other costs reasonably incurred."

4.84.330.[31]  Whether a particular statutory or contractual provision authorizes an award of attorney fees is also a legal question.  Tradewell Grp., Inc. v. Mavis, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993); see also Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012) (reviewing de novo whether there is a legal basis for awarding attorney fees through statute or contract).  If the award of attorney fees depends on a determination of who substantially prevailed, we review that determination de novo as well.  Hawkins v. Diel, 166 Wn. App. 1, 10, 269 P.3d 1049 (2011).

3. Analysis

Stevens argues Hoopoe was not entitled to an award of attorney fees because the trial court did not find Hoopoe to be the substantially prevailing party and because article 9 of the 1997 CC&Rs did not apply to the claims he asserted against Hoopoe.  We reject both arguments.

First, the trial court made the requisite prevailing party finding.  To allow meaningful appellate review, an award of attorney fees must be accompanied by findings of fact and conclusions of law establishing the fee award's justification and reasonableness.  Leda v. Whisnand, 150 Wn. App. 69, 86-87, 207 P.3d 468 (2009).  It is undisputed that the court dismissed all of Stevens's counterclaims against Hoopoe on summary judgment.  In a letter ruling dated July 1, 2016, the court expressly found that Hoopoe was the prevailing party on its motion for summary judgment.  And it laid out its reasoning as to why it had reached this

---

[31] RCW 4.84.330 provides that if a contract allows for an award of attorney fees to one of the parties, then the prevailing party will be entitled to reasonable attorney fees, whether specified in the contract or not.  "An award of attorney fees under RCW 4.84.330 is mandatory, with no discretion except as to the amount."  Hawkins v. Diel, 166 Wn. App. 1, 10, 269 P.3d 1049 (2011).

conclusion. The court's ruling was incorporated by reference into Hoopoe's final judgment against Stevens. The final judgment included an explicit conclusion of law that "Hoopoe is the prevailing party on its Motion for Summary Judgment of Dismissal." Stevens's contention that the court failed to find Hoopoe to be the prevailing party lacks merit.

Second, the trial court did not err in concluding that Stevens's claims against Hoopoe fell within the scope of article 9. The language of Stevens's counterclaims 1 and 2 unambiguously alleged violations of the 1997 CC&Rs. In Stevens's counterclaim 1, he alleged Hoopoe violated the 1997 CC&Rs by voting to adopt the proposed clarification to article 4(a). In counterclaim 2, Stevens alleged Hoopoe violated the 1997 CC&Rs by approving the construction of the fence along his boundary with the common waterfront. Stevens specifically titled these counterclaims as "Violations of Declaration."[32] (Emphasis added.) In counterclaim 7, Stevens asserted that Hoopoe's alleged violations constituted a nuisance under article 9 of the 1997 CC&Rs. Finally, in counterclaim 10, Stevens incorporated by reference the covenant violations alleged in counterclaim 1.

The trial court's conclusion is further supported by Stevens's own pleadings. In summary judgment pleadings relating to article 4(a), Stevens explicitly argued that the clarification to article 4(a) passed by the Owner Plaintiffs, including Hoopoe, was "inconsistent" with the 1997 CC&Rs. And in Stevens's own request

---

[32] Stevens defined "Declaration" as the Declaration of the Amended and Restated Protective Covenants, Conditions and Restrictions of Bellevue Farm Owners Association—essentially the 1997 CC&Rs. Although Stevens's complaint referred, at times, to the 1997 CC&Rs as "CC&Rs" rather than as the "Declaration," the trial court was satisfied that the counterclaims alleging violations of the "Declaration" were, in fact, alleging violations of the 1997 CC&Rs. We agree with this conclusion.

for relief, he sought "reasonable attorney fees and costs as allowed by the [CC&Rs] and Washington law." As the trial court noted, "by alleging that Hoopoe violated the CC&Rs, [Stevens] created a risk that Hoopoe could be ordered to pay [his] attorney's fees and costs under Article 9 of the CC&Rs. Having created that risk, [Stevens] cannot now seek to avoid an award to Hoopoe under Article 9 of the CC&Rs." The trial court did not err in concluding that Hoopoe was entitled to an award of attorney fees under article 9 of the 1997 CC&Rs.

In the alternative, Stevens maintains his counterclaims simply mirrored the Owner Plaintiffs' request for declaratory and injunctive relief. But article 9 explicitly permits parties to seek injunctive relief for violations of the 1997 CC&Rs. That is exactly what Stevens did here. Based on the plain language of Stevens's counterclaims, he alleged violations of the 1997 CC&Rs, thus triggering article 9's attorney fee provision. We affirm the attorney fees awarded to Hoopoe.

F. Order Certifying Hoopoe's Judgment as Final under CR 54(b)

1. Relevant Facts

A year after the trial court dismissed all counterclaims against Hoopoe, Hoopoe moved to certify its judgment against Stevens as final under CR 54(b). The trial court granted the motion on November 3, 2017, finding that delaying entry of a final judgment would cause Hoopoe to suffer substantial hardship and injustice because the litigation had been pending for nearly five years, and although all claims against Hoopoe had been dismissed, tort claims still remained to be adjudicated between Stevens and other Owner Plaintiffs. It further found Hoopoe was incurring legal expenses because it had to retain legal counsel to monitor

events in the case even though Hoopoe was no longer a party. It also found Hoopoe had listed its lots for sale and had demonstrated a need to sell them. The continuing lawsuit, however, impeded Hoopoe's ability to sell the property, and the delay was forcing it to pay property taxes, insurance, and other fees that it would not incur if it could sell the lots. The trial court determined that delaying entry of final judgment "pending resolution of peripheral issues is unjust and will continue to inflict substantial hardship on Hoopoe." It expressly concluded that "[t]here is no just reason for delay in entry of Hoopoe's final judgment." The court entered judgment in favor of Hoopoe and determined that post-judgment interest would begin to accrue as of the date of judgment.

On March 2, 2018, after the 2017 jury trial, the court entered final judgment on all remaining claims and counterclaims between Stevens, BFOA, and the Owner Plaintiffs other than Hoopoe.

### 2. Standard of Review

Stevens argues the trial court erred in certifying Hoopoe's judgment as final under CR 54(b). "A trial court's decision to enter judgment under CR 54(b) is reviewed for abuse of discretion." William G. Hulbert, Jr. v. Port of Everett, 159 Wn. App. 389, 404, 245 P.3d 779 (2011).

### 3. Analysis

"CR 54(b) makes an immediate appeal available in situations in which it could be unjust to delay entering a judgment on a distinctly separate claim until the entire case has been fully adjudicated." Nelbro Packing Co. v. Baypack Fisheries,

L.L.C., 101 Wn. App. 517, 522, 6 P.3d 22 (2000). A trial court may certify a judgment as final under CR 54(b) when there is:

> (1) more than one claim for relief or more than one party against whom relief is sought; (2) an express determination that there is no just reason for delay; (3) written findings supporting the determination that there is no just reason for delay; and (4) an express direction for entry of the judgment.

Id. at 523. Stevens appears to challenge only the trial court's finding that there was no just reason to delay entry of judgment in Hoopoe's favor.

We find no abuse of discretion in the trial court's decision. We have previously indicated that courts should consider the following factors to determine whether there was no just reason for delay:

> "(1) [T]he relationship between the adjudicated and the unadjudicated claims, (2) whether questions which would be reviewed on appeal are still before the trial court for determination in the unadjudicated portion of the case, (3) whether it is likely that the need for review may be mooted by future developments in the trial court, (4) whether an immediate appeal will delay the trial of the unadjudicated matters without gaining any offsetting advantage in terms of the simplification and facilitation of that trial, and (5) the practical effects of allowing an immediate appeal."

Hulbert, Jr., 159 Wn. App. at 406 (alterations in original) (quoting Lindsay Credit Corp. v. Skarperud, 33 Wn. App. 766, 772, 657 P.2d 804 (1983)). "'[T]here must be some danger of hardship or injustice through delay which would be alleviated by immediate appeal.'" Doerflinger v. N.Y. Life Ins. Co., 88 Wn.2d 878, 882, 567 P.2d 230 (1977) (alteration in original) (quoting Campbell v. Westmoreland Farm, Inc., 403 F.2d 939, 942 (2d Cir. 1968)).

The record reveals the trial court considered these factors. As to the first factor, the court found that all claims involving Hoopoe had been "fully and finally dismissed," and the remaining general tort claims had nothing to do with Hoopoe.

It correctly concluded that the adjudicated claims and the remaining claims were distinct and unrelated.

The second and fourth factors also weighed in favor of certification. The court found that "[a]n immediate appeal of this judgment would not delay trial on the tort claims" and that the tort claims "would be appealed on entirely different grounds and involve different issues." Although the trial court did not explicitly address the potential for mootness, the third factor, it did not seem likely that the need for appellate review would be affected by future trial court rulings.

The court also evaluated the practical effects of allowing an immediate appeal of the Hoopoe judgment, the final factor. It found that by allowing an immediate appeal, Hoopoe could avoid incurring attorney fees for monitoring a case in which it was no longer a party. And Hoopoe demonstrated it had listed its Bellevue Farm lots for sale and needed to sell them to avoid further property taxes, insurance, and other costs to hold the properties.

Under these circumstances, the trial court did not abuse its discretion in certifying Hoopoe's judgment as final under CR 54(b).

G. <u>Stevens's Voluntary Dismissal of Fence Claims against BFOA and Owner Plaintiffs, except Glen Corson</u>

1. <u>Relevant Facts</u>

Stevens, BFOA, and the remaining Owner Plaintiffs proceeded to a jury trial on the remaining claims and counterclaims in November 2017. The claims at the start of trial were: (a) BFOA's timber trespass claim against Stevens based on his July 2012 removal of an apple tree from the common waterfront parcel; (b) a timber trespass claim alleged by Baute, Birchfield, and the Kuppermans against Stevens

based on his removal of a willow grove on their joint boundary in January 2011; (c) Dr. Kupperman's negligent infliction of emotional distress claim against Stevens arising out of the alleged shotgun incident in August 2012; and (d) Stevens's three counterclaims against BFOA and the Owner Plaintiffs relating to the boundary fence—namely the allegations that the boundary fence violated his right to equal access to the common waterfront in violation of the 1997 CC&Rs, that the fence constituted a nuisance, and that the fence was a "spite fence" in violation of RCW 7.40.030.

Before opening statements, Stevens moved to voluntarily dismiss, without prejudice, all of the remaining counterclaims against BFOA and the Owner Plaintiffs, with the exception of Corson. Stevens explained:

> The [c]ourt – at the last hearing there was this debate about who were proper parties on the fence. The [c]ourt has already ruled that the fence was built by Mr. Corson and that he built that on his own, not as a, you know, [it] wasn't the HOA's fence. So we had this discussion at the last hearing about who is a proper defendant.

> We looked closely at that issue, and given the [c]ourt's prior ruling on Mr. Corson and the fact that Article 9 allows Mr. Stevens to prosecute a claim against any owner for a nuisance to bring the fence down, Mr. Corson is the only defendant that we need, and that's essentially it.[33]

The trial court indicated that if it granted Stevens's motion, it would do so only with prejudice. It asked Stevens if he wanted to withdraw the motion; Stevens declined to do so but acknowledged that "the statute [of limitations] is past on being able to refile." The trial court dismissed the claims with prejudice.

---

[33] By voluntarily dismissing the counterclaims against all Owner Plaintiffs except Corson, Stevens argued that the trial court should preclude Baute from participating as counsel in any portion of the trial on his counterclaims "because he'll no longer be a defendant." The decision thus appears to have been strategic on Stevens's part.

2. Standard of Review

Stevens appeals the trial court's decision to dismiss the parties with prejudice. We review an order granting a CR 41 motion to dismiss with prejudice for manifest abuse of discretion. Escude v. King County Pub. Hosp. Dist. No. 2, 117 Wn. App. 183, 190, 69 P.3d 895 (2003). Such abuse occurs when the ruling is manifestly unreasonable or discretion was exercised on untenable grounds. Id. CR 41(a)(4) states that in the context of voluntary dismissals, "[u]nless otherwise stated in the order of dismissal, the dismissal is without prejudice." "Under the plain language of the rule it is evident that a trial court may dismiss a claim with prejudice, otherwise the language of the rule would be superfluous." Escude, 117 Wn. App. at 191. Thus, "a trial court has the discretion to grant a nonsuit with or without prejudice, especially as a part of the court's inherent power to impose a sanction of dismissal in a proper case." Id.

3. Analysis

Stevens argues the trial court abused its discretion in dismissing his claims with prejudice because the dismissal did not fall within the limited circumstances in which a dismissal with prejudice is warranted. We disagree. A trial court does not abuse its discretion when it dismisses claims with prejudice that would be time-barred if refiled. See, e.g., id. (dismissal with prejudice appropriate when the applicable statute of limitations has run on the claims). Stevens informed the trial court that the statute of limitations on his fence claims had expired.

Moreover, when parties have litigated claims extensively for over five years, the court has ruled on multiple motions for summary judgment, the parties have

been through a bench trial, and a party chooses for strategic reasons to dismiss claims against multiple parties on the eve of a subsequent jury trial, it is not a manifest abuse of discretion for a court to dismiss the claims with prejudice, even if the statute of limitations has not run.  The trial court properly exercised its discretion to grant Stevens's motion to dismiss but to do so with prejudice.

H.  The Jury's Spite Fence Findings

    1.  Relevant Facts

During pretrial motions in limine, Stevens asked the trial court to exclude any evidence and all argument that BFOA and the Owner Plaintiffs had a legitimate reason for constructing the boundary fence.  He argued that because the fence interfered with his right to use his property and the common waterfront, there could be no valid justification for erecting the fence.  Corson argued the jury had to decide whether any interference was unreasonable, making his reasons for constructing the fence relevant to defend against Stevens's claims.  The trial court granted in part and denied in part Stevens's motion, but it ultimately allowed Corson to offer extensive evidence regarding the reason he originally erected the fence and the reasons other Owner Plaintiffs wanted the fence to remain.

At trial, Stevens testified that on September 16 or 17, 2012, contractors began building a fence along the common waterfront boundary with his property. Corson testified he was the person who made the decision to build the fence.  He used BFOA funds to construct the fence but did not seek Board approval before he spent the money because the bylaws gave him the authority to incur these kinds

of expenses. Corson admitted he knew the fence would make it harder for Stevens to rent his property.

The cedar split rail fence was originally built with five openings. According to Corson, Baute decided where to place the fence openings, depicted on the image below with yellow dots:



These openings, however, did not allow Stevens to roll his trailered dinghy boat into the water. When Corson heard, in the course of this lawsuit, that Stevens was challenging the adequacy of the openings, he removed a nine-foot section at the far corner of the property line, on the south side of Stevens's orchard. But Stevens could not pull his boat across his lot and through the orchard to reach that opening.

And one of the openings nearest to the beach house was partially blocked by a large tree:



Stevens testified that the fence was erected in retaliation for his refusal to sign a revocable license agreement, the document that BFOA members approved at the August 4, 2012 special meeting, which was intended to allow renters limited waterfront access.

The Owner Plaintiffs who testified had differing reasons as to why they thought the fence was appropriate, but their credibility was hotly contested at trial.

Matthew Straight, for example, testified the fence was a "fair, reasonable and appropriate way" of defeating any adverse possession claim Stevens asserted to the common waterfront. But he acknowledged that Stevens had attempted to adversely possess only a small part of the apple orchard in response to being sued by BFOA for timber trespass after removing an apple tree. Birchfield testified she felt the fence was appropriate to resolve disputes with Stevens over mowing the

common waterfront, abating mosquitos, and preventing children driving golf carts from traversing Stevens's land.

Pigott testified the fence helped her special needs teenage son understand that he is not allowed to walk onto Stevens's property. She also felt the fence was an important "symbol" that "we value the common waterfront" in response to Stevens's partition claim. Tom Tucci testified the fence was an appropriate step to demarcate the boundary after Stevens refused to allow Blake Barrett's wedding to occur on the waterfront in front of Stevens's BF Lot #3B. And Christine Doherty thought the fence was installed to resolve trespass issues and to protect the waterfront parcel from Stevens's adverse possession and partition claims.

But there was significant evidence to demonstrate that erecting the fence was retaliatory in nature. For example, the fence does not run the entire length of the waterfront; it is only in front of Stevens's parcel. There is no fence separating the Baute/Kupperman property or any other Bellevue Farm or South Bellevue Farm lot from the waterfront, despite the fact that many of these owners rent their properties to short-term vacationers.

When jurors asked Baute why he felt it was appropriate to decide where to place openings in the fence without input from Stevens, Baute testified he did so because Stevens had "recently fired a shotgun at me, refused to meet with me, and told me to get off his property." Baute had to concede that an opening directly in front of Stevens's beach house would have been much more convenient and practical than the locations he selected.

Additionally, the way in which Corson and Baute maintained the fence after it was erected also raised issues regarding their true motives. Stevens explained to the jury that during the lawsuit, he obtained a court order allowing his renters to access the waterfront, pending the outcome of the case. But while the stay was in place, Stevens discovered someone had placed "Owners Only" signs along the fence and had installed chains across all of the openings.

Corson testified he did not install the chains or tape, but he told Baute that he could do so "if they were necessary." Corson could not say how long the chains had been across the openings, indicating Baute was the person "given the assignment of dealing with the chains." But he knew ahead of time that Baute intended to install both chains and duct tape to keep Stevens's renters off the waterfront.

Baute confirmed he installed the chains across four of the openings in the fence in the summer of 2016 as a way of enforcing article 4(a). But Stevens's renters were hopping over the chains and leaving items on the common dock. So he added more chains.



After Stevens removed the chains to allow his young son to get through, someone replaced the chain, put up more "No Trespassing" signs, and even used duct tape to prevent people from walking through the opening.



Baute confirmed he was the one who added the "No Trespassing" sign and the duct tape because the tenants continued to breach the barrier.

Stevens testified that someone removed the chains and tape just before the jury traveled to Bellevue Farm for a site inspection in December 2017. Baute disputed this testimony, claiming Stevens removed the chains and tape approximately 10 days after Baute put them up. Corson conceded the chains and tape were "a horrible idea."

The jury returned a verdict for Stevens and against Corson on December 14, 2017.[34] It found that the fence violated Stevens's rights under the 1997 CC&Rs to equal and non-exclusive access, use, and enjoyment of the common waterfront, that the fence was installed for the purpose of interfering with Stevens's usage rights, that the fence was a nuisance, and that the fence was a spite fence under RCW 7.40.030.

In March 2018, the trial court entered final judgment on the jury's verdict, decreeing that the fence between Stevens's property and the common waterfront was a nuisance in violation of article 9 of the 1997 CC&Rs and a spite fence under RCW 7.40.030. The trial court ordered Corson to remove the fence.

### 2. Standard of Review

Corson challenges several rulings from the jury trial. He argues the trial court erred in giving Instruction 18 and in excluding evidence regarding the reasons Corson and other Owner Plaintiffs supported the installation of the fence. Stevens cross appeals, arguing the trial court erred in allowing Corson to introduce

---

[34] The jury awarded monetary damages of $1,800 to BFOA and the Owner Plaintiffs for the cost to replace the apple tree Stevens inadvertently cut down in 2012 and awarded $10,000 to Baute, Birchfield, and the Kuppermans to replace a willow grove Stevens removed in 2011. Stevens has not appealed these jury awards.

any evidence that he and the other Owner Plaintiffs had legitimate reasons for constructing the fence.

This court reviews jury instructions de novo and evidentiary rulings for manifest abuse of discretion. Cox v. Spangler, 141 Wn. 2d 431, 439, 442, 5 P.3d 1265 (2000). A trial court abuses its discretion "[w]hen it takes a view no reasonable person would take, or applies the wrong legal standard to an issue." Id. at 439.

### 3. Analysis

#### a. Instruction 18

Corson argues Instruction 18 misstated the law and misled the jury. We conclude Corson failed to properly object to this instruction below and has not preserved the issue on appeal.

CR 51(f) requires each party to submit proposed instructions and to object to any instructions proposed by any other party: "The objector shall state distinctly the matter to which counsel objects and the grounds of counsel's objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made." This requirement allows the trial court to remedy any error before instructing the jury. Washburn v. City of Federal Way, 178 Wn.2d 732, 746-47, 310 P.3d 1275 (2013). "The pertinent inquiry on review is whether the exception was sufficient to apprise the trial judge of the nature and substance of the objection." Crossen v. Skagit County, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983). If the trial court understands the reasons a party objects to an

instruction, the party has preserved the objection for review. Washburn, 178 Wn.2d at 747.

Corson objected to Instruction 18 but merely said, "Plaintiffs object to use of this instruction in its entirety." There is nothing in the record to indicate Corson adequately informed the trial court of the grounds for the objection. We conclude Corson's objection to Instruction 18 was inadequate under CR 51(f) to preserve this error for appeal.

### b. Evidentiary Rulings

Stevens argues the trial court abused its discretion in admitting evidence that Corson or any other Owner Plaintiff had a legitimate reason for putting up the fence. Corson argues the trial court erred in excluding some of the evidence he felt was relevant for why he and the other Owner Plaintiffs wanted to erect the fence. We reject both evidentiary arguments.

Stevens moved to exclude any evidence that BFOA and the Owner Plaintiffs had a reason for interfering with his use and enjoyment of the common waterfront, arguing that one co-tenant has no right to interfere with the use and enjoyment of property by another co-tenant. He maintained that the reasons Corson had for building the fence were irrelevant; the only issue was the effect of the fence on his access or use of the common waterfront. The trial court rejected this argument:

> I think they have the right to put up the fence, to begin with, because co-tenants, any co-tenant has the right to put an improvement on the commonly owned property, and that's what they did. Now the question is: Did that fence unreasonably interfere? So I'm going to deny [Stevens's] motion. . . .

> But I will deny the motion of that [sic] that the reasons for the fence are to be – that there should be no mention or testimony or evidence as to the reasons for putting the fence up.

The trial court's reasoning was correct.

Under the spite fence statute, RCW 7.40.030, Stevens had to prove that the fence (1) damaged his enjoyment of the property, (2) was designed as the result of malice or spitefulness, and (3) served no useful or reasonable purpose. Baillargeon v. Press, 11 Wn. App. 59, 66, 521 P.2d 746 (1974). The jury was instructed on these elements of this claim. To rebut Stevens's evidence of malice or spitefulness, or evidence that the fence had no useful purpose, Corson had the right to present evidence of the purpose he and the other Owner Plaintiffs believed the fence served. The jury was then tasked with evaluating the credibility of both parties' evidence. Because the evidence was relevant, the trial court did not abuse its discretion in denying Stevens's motion to exclude the evidence.

Corson makes the opposite argument—that the court erred in excluding some of the evidence he wanted to offer to justify the fence. Corson maintains that exclusion of the following evidence prejudiced him at trial: (1) Stevens's 2009 e-mail stating he no longer wanted to be a part of BFOA, (2) evidence that Stevens refused to sign a tenancy in common agreement as to the waterfront property, (3) evidence that Stevens fired his shotgun at other homeowners near the boundary fence,[35] (4) testimony from BFOA's real estate expert, Sam Buck, as to the lawful purposes of the fence and the positive effect of the fence on Stevens's property values, (5) evidence of a contemporaneous boundary line and usage

---

[35] There was extensive evidence regarding this shotgun incident before the jury.

dispute involving a communal tennis court, (6) evidence that Stevens provided watercraft to his rental tenants, and (7) evidence that the San Juan Preservation Trust approved of the boundary line fence.

But Corson does not explain why the trial court's rulings were an abuse of discretion or what effect, if any, this evidence would have had on the outcome of the case. Corson merely states that had the evidence been included, "the jury may not have returned the same verdict" because it affected his ability to present his case.

We refuse to address this issue because Corson did not adequately brief it. RAP 10.3(a)(6) requires an argument "together with citations to legal authority and references to relevant parts of the record." Corson presented no authority to support his claimed error. And the only citations to the record are to Stevens's motions in limine seeking to exclude the evidence, not to the court rulings being challenged. Stevens pointed out the inadequacy of the briefing in his response brief, but Corson did not remedy the insufficient argument in his reply. Because the inadequate briefing prevents meaningful review, we decline to review Corson's evidentiary arguments. See Hernandez v. Stender, 182 Wn. App. 52, 60, 358 P.3d 1169 (2014) (court will decline to review alleged evidentiary error where party fails to cite to any portion of record to support argument).

I. The Injunction Requiring Removal of the Spite Fence

1. Relevant Facts

After the jury rendered its verdict, Stevens noted for presentation a proposed final judgment that included an injunction requiring Corson to remove the fence. The language Stevens proposed read:

> [T]he [c]ourt hereby [o]rders a mandatory injunction compelling the abatement and removal of the fence in front of Chad Stevens's property at Bellevue Farm. The [c]ourt further [o]rders a permanent injunction against the future erection of a fence or similar structure along any portion of the boundary line between Chad Stevens's property and the common waterfront at Bellevue Farm. This Decree is binding on all parties in this matter.

BFOA and the Owner Plaintiffs, including Corson, opposed this requested injunctive relief. Mathew Straight, now BFOA's president, submitted a declaration in which he asked the court to order nothing more than the removal of a small section of the fence. Corson testified he had been instructed by Straight not to touch the fence, and Corson indicated he "will not disregard his instructions."

At a February 2, 2018 hearing, the trial court stated its intention to enter an order requiring Corson to remove the fence, but it rejected Stevens's proposed language imposing a permanent injunction on future fences. Corson argued that when Stevens chose to dismiss his fence claims against all Owner Plaintiffs, other than Corson, the court lost jurisdiction over them and could not order them to remove the fence. The court agreed that because the other Owner Plaintiffs had been dismissed, it could not enter an order obligating them to do anything. But it reasoned that because both Corson and Stevens are part owners of the common waterfront, the court could think of no other way in which to enforce the jury's

verdict other than to issue an injunction against Corson. From the court's perspective, Corson put the fence up so he should be the one to tear it down. The final judgment thus included an order compelling Corson to remove the fence. Corson challenges this injunction.

### 2. Standard of Review

We review a trial court's issuance of an injunction for abuse of discretion. Lenhoff v. Birch Bay Real Estate, Inc., 22 Wn. App. 70, 74, 587 P.2d 1087 (1978). "Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Id. at 75 (quoting State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

### 3. Analysis

Corson argues the trial court erred in issuing the injunction because it failed to conduct an analysis of the factors set out in Lenhoff.[36] Stevens contends Lenhoff is inapplicable because an injunction is "mandatory" under RCW 7.40.030. We disagree with both arguments.

RCW 7.40.030 provides that "[a]n injunction may be granted to restrain the malicious erection . . . of any structure intended to spite, injure or annoy an adjoining proprietor." (Emphasis added.) The statute further provides that when an owner has maliciously erected a spite structure with this intent, "a mandatory

---

[36] We reject Corson's argument that a "tasteful boundary line fence" cannot be a spite fence as a matter of law. First, Corson cites no authority for this proposition. Second, under Baillargeon, a fence can be a spite fence under RCW 7.40.030 if maliciously erected, even if tasteful or erected along a boundary. 11 Wn. App. at 66.

injunction will lie to compel its abatement and removal." RCW 7.40.030. The phrase "mandatory injunction" is a term of art. It does not mean that the trial court lacks discretion to deny injunctive relief. Rather, a mandatory injunction is "an injunction that orders an affirmative act or mandates a specified course of conduct." BLACK'S LAW DICTIONARY at 937-38. Whether a court issues a mandatory injunction—for instance, compels a party to take some specified action—is discretionary. Lenhoff, 22 Wn. App. at 74-75; see also Holmes Harbor Water Co. v. Page, 8 Wn. App. 600, 603, 508 P.2d 628 (1973). In exercising this discretion, the court should evaluate:

> (a) the character of the interest to be protected, (b) the relative adequacy to the plaintiff of injunction in comparison with other remedies, (c) the delay, if any, in bringing suit, (d) the misconduct of the plaintiff if any, (e) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied, (f) the interest of third persons and of the public, and (g) the practicability of framing and enforcing the order or judgment.

Lenhoff, 22 Wn. App. at 75.

The trial court explicitly discussed the Lenhoff factors in analyzing Stevens's requested injunctive relief. First, the trial court evaluated the nature and character of Stevens's interest in the removal of the fence. It concluded that his interest was high in light of the jury's findings that the fence was erected for the purpose of interfering with his rights under the 1997 CC&Rs to equal and exclusive access, use, and enjoyment of the common waterfront. The trial court also reasoned that if Corson and the Owner Plaintiffs have an interest in demarcating the boundary between Stevens's property and the waterfront, Corson could have done so in much less restrictive ways.

Second, the trial court looked at options other than injunctive relief and concluded that there really was no alternative method to enforce the jury's verdict. The evidence at trial supports the jury's finding that the fence denies Stevens the same access and use of the waterfront that other homeowners enjoy.

Third, the court considered Corson's argument that Stevens had "unclean hands" by committing timber trespass, but it also found that Corson, BFOA, and the Owner Plaintiffs had similarly committed misconduct by blocking the fence openings with "No Trespassing" signs, chains, and tape at a time when the court had stayed enforcement of article 4(a). It concluded that not enforcing the jury's verdict would diminish the impropriety of their actions.

Fourth, the trial court was aware of and considered BFOA's contention that the removal of the fence contravened the wishes of the Owner Plaintiffs. But article 9 of the 1997 CC&Rs, to which all Owner Plaintiffs are bound, explicitly gives the court the authority to enjoin any nuisances and violations of the 1997 CC&Rs. Because the jury found that the fence violated the 1997 CC&Rs and was a nuisance, article 9 gave the court the legal authority to order the fence's removal, regardless of the wishes of BFOA or the Owner Plaintiffs.

Fifth, the trial court noted that the interests of BFOA's members, as tenants in common, were not affected by the removal of the fence because the boundary line can, and should, be demarcated by other means. This was supported by Corson's testimony that the boundary lines on other properties were demarcated in other ways, such as by privacy hedges and fence posts.

Finally, the trial court understood that Corson, the only remaining defendant and the only person it could order to remove the fence, was no longer BFOA's president. But it did not find that this fact justified not issuing an injunction because Corson, as a Bellevue Farm owner, has a property interest in the common waterfront. He has an obligation to refrain from committing nuisance and violating the 1997 CC&Rs. Practically speaking, as the trial court noted, Corson erected the fence, so he can take it down.[37] Thus, the trial court reasoned that an injunction requiring removal of the fence could have been enforced against Corson.

We conclude the trial court engaged in a sufficient inquiry under Lenhoff and did not abuse its discretion when it issued the injunction because such relief was explicitly authorized by article 9 of the 1997 CC&Rs.[38]

## J. Order Denying Fees to BFOA and Owner Plaintiffs under Article 9 of the 1997 CC&Rs

### 1. Relevant Facts

At the conclusion of the 2016 bench trial, the trial court found BFOA to be the prevailing party. BFOA then moved for an award of attorney fees under RCW 64.38.050. The trial court denied the request, concluding the case was not appropriate for such an award.

---

[37] Corson argues that because he has no legal authority to remove the fence, the trial court's injunction is improper. Counsel for BFOA told this court at oral argument that, despite the jury's finding that the fence violates the 1997 CC&Rs, BFOA intends to interfere with Corson's compliance with the court's injunction. Corson and BFOA should carefully consider the ramifications of disobeying or aiding and abetting another in disobeying a lawful court order.

[38] BFOA and the Owner Plaintiffs also assert on appeal that an injunction was inappropriate because the trial court stated that there were lawful reasons for the fence. They argue that if true, the fence cannot be a spite fence as a matter of law. This argument ignores the jury's finding that the fence was a nuisance, a spite fence, and violated the 1997 CC&Rs. The trial court was bound by this factual determination whether it agreed or not.

After Stevens voluntarily dismissed all remaining claims against BFOA and the Owner Plaintiffs during the jury trial in 2017, BFOA and the Owner Plaintiffs again moved for an award of attorney fees under article 9 of the 1997 CC&Rs, arguing that they—like Hoopoe—were the prevailing parties on those counterclaims alleging violations of the 1997 CC&Rs. The trial court denied the request for attorney fees, finding that no party substantially prevailed and that each party prevailed on major issues throughout the litigation.

BFOA and the Owner Plaintiffs appeal the denial of their request for attorney fees against Stevens.

2. Analysis

a. Fees under RCW 64.38.050

BFOA argues the trial court erred in denying its claim for attorney fees under RCW 64.38.050. RCW 64.38.050 provides that "[t]he court, in an appropriate case, may award reasonable attorneys' fees to the prevailing party." The statute gives the trial court the authority to award attorney fees to a homeowner association "to recoup expenses incurred in defending against nonprevailing homeowners." Casey v. Sudden Valley Cmty. Ass'n, 182 Wn. App. 315, 333 n.16, 329 P.3d 919 (2014). But such an award is not mandatory. The term "may" in a statute generally confers discretion. Freeman v. Freeman, 169 Wn.2d 664, 671, 239 P.3d 557 (2010); see also Hernandez v. Edmonds Memory Care LLC, 10 Wn. App. 2d 869, 875-76, 450 P.3d 622 (2019) (attorney fee statute

providing that court "may" award fees to prevailing party gives the court discretion to do so).

We review a discretionary decision to award attorney fees for an abuse of discretion. Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 715, 9 P.3d 898 (2000). A trial court abuses its discretion if its decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" Tribble v. Allstate Prop. & Cas. Ins. Co., 134 Wn. App. 163, 170, 139 P.3d 373 (2006) (quoting State ex rel. Carroll, 79 Wn.2d at 26).

In Roats v. Blakely Island Maintenance Commission, Inc., 169 Wn. App. 263, 284, 279 P.3d 943 (2012), the trial court denied a homeowner's request for attorney fees under RCW 64.38.050, despite finding 18 violations of RCW 64.38.035. This court affirmed, reasoning:

> Here, the trial court determined that the Roatses had proved 18 of the 28 purported open meetings violations. However, it determined that an affirmative grant of relief was not warranted on these 18 claims. Under these circumstances, the trial court's denial of the Roatses' request for an award of attorney fees was within the range of acceptable choices available to the court. Thus, the trial court did not abuse its discretion by denying the Roatses' request.

Id.

In this case, the trial court ruled in favor of BFOA on 7 of Stevens's 10 claimed violations of chapter 64.38 RCW. But, as in Roats, the trial court decided the case was not an appropriate one for an award of fees because although BFOA prevailed on some claims, it did not prevail on all of them. The court found that BFOA's directors failed to meet regularly in violation of its bylaws, violating RCW 64.38.025(1). And the court was troubled by the homeowner association's

"undocumented practice" of allowing its president to conduct BFOA business without direction from or authorization by the Board or BFOA members. These reasons for denying BFOA's request for attorney fees were within the range of acceptable choices available to the court. Therefore, it did not abuse its discretion in denying BFOA's request.

### b. Fees under Article 9 of the 1997 CC&Rs

BFOA and the Owner Plaintiffs, excluding Corson, argue that they became the substantially prevailing party on all counterclaims covered by article 9 of the 1997 CC&Rs when Stevens voluntarily dismissed his remaining claims against them on the eve of trial. We agree.

Whether a party is a prevailing party is a mixed question of law and fact and is reviewed under the error of law standard. Eagle Point Condo., 102 Wn. App. at 706. "As a general rule, a prevailing party is one who receives an affirmative judgment in its favor." Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 158 Wn. App. 203, 231, 242 P.3d 1 (2010). "If neither party wholly prevails then the party who substantially prevails is the prevailing party, a determination that turns on the extent of the relief afforded the parties." Transpac Dev., Inc. v. Oh, 132 Wn. App. 212, 217, 130 P.3d 892 (2006). If neither party obtains a final judgment against the other, neither party is entitled to attorney fees. Wachovia SBA Lending, Inc. v. Kraft, 165 Wn.2d 481, 492, 200 P.3d 683 (2009).

When evaluating whether BFOA or the Owner Plaintiffs were the substantially prevailing party, the trial court considered the outcome of all the claims and counterclaims—some of which fell within the scope of article 9's

attorney fee provision and some which did not. Article 9 authorizes an award of attorney fees only to the party who prevails in an action for violations of the 1997 CC&Rs. Under RCW 4.84.330, "prevailing party" means the party in whose favor final judgment is rendered. When article 9 is read in conjunction with RCW 4.84.330, the prevailing party is the party in whose favor judgment was entered on claims falling within the scope of article 9. Here, judgment was entered in favor of BFOA and the Owner Plaintiffs on Stevens's dismissed article 9 counterclaims. For this reason, the trial court erred in concluding that BFOA and the Owner Plaintiffs were not the prevailing party on these counterclaims. We therefore reverse the trial court's order denying an award of attorney fees to BFOA and the Owner Plaintiffs and remand for a determination as to which claims fell under article 9 and for which the Owner Plaintiffs may recover attorney fees.

We note, however, that attorney fees are recoverable strictly for those services related to the causes of action which allow for fees. Travis v. Wash. Horse Breeders Ass'n, 111 Wn.2d 396, 410, 759 P.2d 418 (1988). BFOA and the Owner Plaintiffs are entitled to attorney fees incurred in defending Stevens's counterclaims for violations of the 1997 CC&Rs. But they are not entitled to attorney fees incurred in prosecuting their claims against Stevens or the fees incurred in defending Corson from Stevens's fence claims. Given that the same attorneys represented BFOA, the Owner Plaintiffs, and Corson, the trial court must determine on remand if BFOA and the Owner Plaintiffs can segregate recoverable attorney fees from non-recoverable fees. And if BFOA and the Owner Plaintiffs interfere with Corson's obligation to remove the spite fence, the trial court is also

free to evaluate whether these parties have forfeited their claim to attorney fees by interfering with Corson's duty to abate a violation of the 1997 CC&Rs.

### III.  ATTORNEY FEES ON APPEAL

Article 9 and RCW 4.84.330 provided for attorney fees at trial, and these same provisions support an award on appeal.  Atlas Supply, Inc. v. Realm, Inc., 170 Wn. App. 234, 241, 287 P.3d 606 (2012).  Because Hoopoe prevailed on appeal, it is entitled to reasonable fees and costs subject to its compliance with RAP 18.1.  Because we reverse the trial court's denial of attorney fees to BFOA and to the Owner Plaintiffs under article 9 of the 1997 CC&Rs, we award these parties attorney fees incurred on this single issue, subject to their compliance with RAP 18.1.  We deny Stevens's request for attorney fees.

### IV.   CONCLUSION

We affirm the jury's verdict and trial court's rulings, with the exception of the order denying attorney fees to BFOA and the Owner Plaintiffs for the fees incurred in defending against Stevens's counterclaims for violations of the 1997 CC&Rs.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Verellen, J._